UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>            v.<br><br>MARK E. CRAWFORD,<br><br>        Defendant. | 1:02-CV-06498 OWW<br><br>1:96-CR-05127 OWW<br><br>MEMORANDUM DECISION AND ORDER DENYING MARK CRAWFORD'S § 2255 PETITION (1:96-CR-05127, DOC. 812) |

I.   INTRODUCTION

Before the court for decision is Defendant Mark Crawford's ("Crawford" or "Petitioner") motion pursuant to Title 18, United States Code, section 2255 ("Petition"). Petitioner contends that he did not receive the effective assistance of counsel during his June 1999 trial, which resulted in a jury convicting him of racketeering, racketeering conspiracy, murder in the aid of racketeering, kidnapping in the aid of racketeering, conspiracy, embezzlement from an employee welfare benefit plan, six counts of wire fraud, three counts of money laundering,

obstruction of justice by killing a witness, obstruction of justice by retaliation against a witness (murder), threatening to commit a crime of violence against a witness, and three counts of perjury.  Petitioner is currently incarcerated, serving a life sentence.[1]  Doc. 720.[2]

Crawford's central contentions are that his lead trial counsel, Bill May: (1) was unprepared for trial and was impaired by physical, emotional, financial, and legal problems during trial; (2) failed to call a key defense witness, William Noel, who May indicated in his opening statement would testify; and (3) had an actual conflict of interest that adversely affected his representation of Petitioner.  Crawford maintains that he received a constitutionally inadequate defense warranting a new trial.

## II.  PROCEDURAL HISTORY

A.  Original Petition.

The original Petition alleged that Petitioner's lead trial counsel, Bill May, was ineffective in seven respects: (1) May failed to secure the attendance of a key defense witness, William Noel, who purportedly would have testified

_____

[1] Defendant was sentenced to a life term on counts 1, 2, 3, 17 and 18; a 240 month term on Counts 14, 15, and 16; a 120 month term for Count 4; and a 60 month term on Counts 5, 6, 7, 8, 10, 11, 12, 13, 19, 20, 21, 22, all to be served concurrently for a total term of life imprisonment.
[2] Unless otherwise noted, all "Doc." references are to docket entries in 1:96-cr-5127 OWW.

to a conspiracy to frame Petitioner for the murder of Nick Brueggen; (2) May failed to adequately prepare for trial, having admitted as much to Petitioner; (3) May suffered "overwhelming personal and financial problems" compromising counsel's duty of loyalty and creating a conflict of interest; (4) May suffered financial, emotional, and psychological problems contributing to his ineffectiveness as trial counsel; (5) May slept through certain portions of the trial proceedings; (6) May failed to offer Petitioner's sons' school attendance records into evidence to corroborate Petitioner's alibi defense; and (7) May failed to object to the prosecution's closing argument that Petitioner's sons were at school all day on the day of the murder.  Doc. 812.

B.    **Prior Evidentiary Rulings**

        Several preliminary, evidentiary matters were determined by separate Memorandum Decision.  Doc. 932.  Petitioner's reply brief ("Reply") included numerous factual claims that were not discussed in the original petition, namely, that: (1) May failed to call other key witness; (2) May failed to call expert witnesses; and (3) arguments pertaining to May's disciplinary records.  1:02-cv-06498, Doc. 7-1.  Petitioner moved to expand the record with materials submitted as exhibits to the Reply relating to these new factual claims. *Id.*, Doc. 9.  The government opposed this motion in part and

moved to strike certain portions of Crawford's Reply, along with certain exhibits thereto, as time-barred.  Doc. 920.

The Reply was construed as a motion to amend the Petition subject to the relation back doctrine.  Doc. 932 at 6-7.  The motion to amend was granted as to evidence pertaining to May's alleged failure to call Petitioner's sons' Principal as a witness, *id*. at 21-22, but denied as to all other evidence regarding May's failure to call other witnesses, including fact witnesses Todd Houston, Robert Weekley, and Amber Miller, *id*. at 15-17, and several purported expert witnesses, *id*. at 18-21.  The government's motion to strike newly offered evidence pertaining to May's disciplinary record was granted on the ground that the offered evidence did not reflect a pervasive pattern of conduct or conduct related to May's alleged failure to prepare for trials and/or the allegation that May operated under a conflict of interest.  *Id*. at 22-24.

Defendant also moved to produce certain Criminal Justice Act ("CJA") billing records and CJA 20 forms submitted by May in the context of the underlying criminal trial.  The billing records were requested because Plaintiff believed they would help establish that May was unprepared for trial.  1:02-cv-06498, Doc. 8.  The CJA 20 forms require counsel to disclose under penalty of perjury any outside income earned during the

course of a CJA-funded representation.  Crawford alleges that May never informed the CJA Panel Administrator of certain private compensation he was receiving during the trial and suggests that this failure, if proven, might undermine May's credibility.  Defendant's motion was granted as to the CJA 20 Forms, but denied as to the billing records, because the billing records would shed no additional light on Petitioner's allegations.  Doc. 932 at 25-26.  The CJA Panel Administrator produced the CJA 20 forms and the parties were permitted to, and did, submit supplemental briefs concerning those records.  *Id*. at 27; Docs. 937 & 939.

The court heard oral argument on the Petition before its submission.


### III.   FACTUAL BACKGROUND.

A.   Overview of the Enterprise.

The charges in this case relate to the organized crime activities of a racketeering enterprise known as the "Family," which was based in Southeast Texas and led by Petitioner, the former mayor of Ingleside, Texas.  The charged members of the Family were defendant Mark E. Crawford, Frank R. Bochicchio, John R. Crawford (Defendant's brother), Mike Beckcom, Kirk A. Johnson, David Franco, George N. "Nick" Brueggen, Juan P. Galvan, and others.  The evidence at trial established that Mark Crawford was the leader of the

Family, and that he gave other members large, distinctive gold rings, with the Chinese symbol for "family" emblazoned on them.  Reporter's Transcript of Trial ("R.T.") at 775-76 (Sipila).  The ring symbolized loyalty, both to each other and to Family boss Mark Crawford.  *Id.*; R.T. 2632:22-23 (Beccom).  The ring also meant that "anybody who fucks with the Family is going to fucking pay."  R.T. 776:14-15 (Sipila).

The Family members' crimes, as charged in the indictment and proven at trial, fall into four main categories:

> (1) Operation of a phony health insurance company, "Viking Casualty Company," which defrauded health plan participant victims in and around Fresno, California;

> (2) Operation of multiple employee staff leasing companies in southeast Texas and in Gulfport, Mississippi, which defrauded their clients and the IRS;

> (3) Operation of a phony "Builder's Home Warranty" insurance company in southeast Texas, with victims in Colorado and elsewhere; and

> (4) Kidnapping and murder of one of the Family's own members, Nick Brueggen, after he began to cooperate with federal law enforcement authorities in the

Eastern District of California conducting a grand jury investigation into Viking Casualty Company.

**B.** **The Viking Casualty Company Scam.**

Count One's racketeering predicate acts one (embezzlement from an employee welfare benefit plan), two (wire fraud), three (money laundering), and four (money laundering conspiracy) all pertain to Mark Crawford's participation in a fraudulent insurance company with John Crawford, George Brueggen, Harry Clift, and others. *See* Second Superseding Indictment, Doc. 88 at 2-13.

From the fall of 1992 through 1995, a company called Ararat International Administrators ("Ararat") operated in Fresno, California. R.T. 281 (Rodriguez). Ararat was a third party administrator of health insurance plans for small businesses. R.T. 280. Ararat accepted premiums from small business clients and, after deducting administrative fees, forwarded the premiums to an insurance carrier for underwriting to provide health benefits for plan participants (employees of the businesses). R.T. 281.

In late 1992, Ararat was looking for an insurance company to serve as its underwriter. R.T. 282. Insurance brokers Jarman Holland and James Carroll, of Tennessee, helped Ararat find Viking Casualty Company ("Viking"), based in Corpus Christi, Texas. R.T. 316-20 (Carroll). During the

7

search for Viking, James Carroll spoke initially with defendants George N. Brueggen and Harry E. "Skip" Clift, who represented themselves as representatives of Viking.  R.T. 321.  Both Brueggen and Clift told Carroll that Viking was willing to take over the risk and assume the business forwarded by Ararat.  R.T. 321-22.

On March 25, 1993, Carroll and Holland, acting as representatives of Ararat, traveled to Corpus Christi to meet with Viking officials and finalize the arrangements for Viking to assume the Ararat block of business.  R.T. 338.
Mark Crawford and his brother John Crawford met Carroll and Holland at the airport, and brought them to what the Crawfords represented was Viking's headquarters.  *Id*.
Brueggen and Harry Clift were brought in to the meeting and introduced as Viking executives.  R.T. 340-41, 343.  Ararat and Viking agreed in writing that Viking would assume health benefit underwriting for Ararat's clients.  R.T. 343-44.  The agreement called for Ararat to collect health insurance premiums and keep 22.5% for its administrative fees and costs.  R.T. 347.  Ararat was also to keep 40% of the premiums collected to pay small claims, and remit the balance (minus agents' fees) to Viking.  R.T. 347-48.  This amount remitted to Viking was approximately 30% of premiums collected.  *Id*.  The money, held in a trust account in

Tennessee, R.T. 348, was to be wire transferred to an account set up by Brueggen, in Houston, Texas, R.T. 350.

Viking was an admitted insurance carrier in the District of Columbia, but was suspended, as of December 31, 1992, from conducting any business.  R.T. 481-82 (Sheppard).  Viking had never applied to do business in the State of California, and a Certificate of Authority permitting Viking to do such business has never been issued.  R.T. 496 (Torrescano). Viking was seriously undercapitalized and was essentially without assets.  *See* R.T. 482.

Racketeering predicate act one (embezzlement from an employee welfare benefit plan) encompassed the whole of Mark Crawford's conduct regarding Viking Casualty Company and the premium funds received from Ararat International Administrators.  Doc. 88 at 6-9.  From March 1, 1993, through July 30, 1993, Ararat transmitted $222,573 in health insurance premium funds to Viking accounts under the control of Brueggen, Mark Crawford, and John Crawford.  R.T. 698 (Spjute).  When Ararat submitted claims to Viking on behalf of its policyholders, Viking did not pay them, R.T. at 719, and instead kept the premium funds for the Crawfords' use and benefit.

Racketeering predicate act two (wire fraud) consisted of three sub-predicates, each pertaining to a specific document

sent over the wires.  Doc. 88 at 9-10.  Sub-predicate one was a March 29, 1993 facsimile from Brueggen, as a representative of Viking, to Ararat representative James Carroll, *id.* at 10, instructing Carroll to send Money to a Houston account, R.T. 350.  Sub-predicate two was an April 8, 1993 facsimile from James Carroll to Brueggen, breaking down how premium payments would be distributed.  R.T. 353.  Sub-predicate three was a June 8, 1993 facsimile from Brueggen to Jarman Holland, Carroll, and VK Holding Company, requesting payment of fees to Viking Casualty and himself (Brueggen).  R.T. 357.

C.   The Staff Leasing Scam.

Racketeering predicate acts fourteen (wire fraud), fifteen (money laundering), and sixteen (money laundering conspiracy) all pertain to the participation of defendant Mark Crawford and his co-defendants in the Family's fraudulent staff leasing companies, including, but not limited to, Superior Employee Leasing and StaffPro.  Doc. 88 at 24-28.  A staff leasing company contracts to hire all of a client business's employees, and then leases those employees back to the client.  The staff leasing process defers expenses, such as payroll, quarterly payment of the employer's share of employee tax withholdings to the IRS, and the payment of workers' compensation insurance.  *See generally* R.T. 2092-94 (Zamora).

The Family's staff leasing businesses assured its clients that they would duly hold and forward all payroll taxes owed to the IRS.  The companies would collect the employer's share of the employees' withholding tax payments from client companies.  However, instead of forwarding all of the taxes to the IRS, the Family pocketed much of the money.  *See generally* R.T. 900-02 (McGuill); R.T. 1017-19 (Tichenor); R.T. 1391 (Cagle).  The Family's staff leasing companies failed to pay taxes due and often failed to file tax returns at all for the businesses to which it leased employees.  *See generally* R.T. 2067-81 (Zamora).  The scheme netted the Family millions of dollars in just a few years.  *Id*.

Between 1993 and 1996, Family members acting under the direction of Mark Crawford formed a number of overlapping and interrelated staff leasing companies.  The strategy was to operate these businesses, pocket the payroll tax and insurance money, and, when the IRS started closing in, shut the company down, declare bankruptcy, and transfer the clients to a new employee staff leasing company under another Family member's name.  *See* R.T. 1347-49, 1354 (Beckcom); R.T. 895 (McGuill); R.T. 962-64 (Moreno); R.T. 1013-1017; R.T. 1093 (Tichenor).  The scheme generated tens of thousands of dollars for Mark Crawford and the Family per week.  At one point Mark Crawford alone was incurring at least $35,000 per

month in personal expenses.  *See* R.T. 2121 (Zamora); R.T. 1349 (Beckcom).

All of the staff leasing businesses were interrelated. Defendant Mark Crawford, often together with his brother, John, acted as the boss.  *See, e.g.,* R.T. 752-54 (Sipila), R.T. 888 (McGuill), R.T. 1348 (Beckcom).  Co-defendant Bochicchio put the bank accounts in his name for multiple businesses.  *See, e.g.*, R.T. 772, 853-54 (Sipila); R.T. 1524, 1527 (Obenhaus).  Co-defendant David Franco was the accountant for all of the companies.  R.T. 778-79 (Sipila). Galla McGuill was bookkeeper.  R.T. 888-92 (McGuill). Multiple businesses operated from the same offices.  *Id*.  No matter which Family member a business might nominally belong to, money was siphoned out to support Mark Crawford and his fellow Family members and friends in lavish style, and to maintain the enterprises.  *See, e.g.,* R.T. 786-90, 793-94, 806-07 (Sipila); R.T. 899 (McGuill); R.T. 964-67 (Moreno); *see generally* R.T. 2094-110 (Zamora).

The evidence established that the various companies and their revenues were, as a practical matter, completely interchangeable.  As one witness put it, "everything got intermeshed and intertwined -- it all became a big mess." R.T. 850, 852 (Sipila); *see generally* R.T. 1013-17 (Tichenor).  For example, money would be siphoned out of

Superior Employee Leasing and transferred to StaffPro, and "vice versa."  R.T. 794-96 (Sipila).  This would occur by dummy payments to individuals, or by wire transfers.  R.T. 798-802; *see generally* R.T. 1186-91 (R. Garza).  Large payments from these interchangeable accounts would often go to Bochicchio.  *See, e.g.,* R.T. 802-03 (Sipila); R.T. 903-04, 932 (McGuill); R.T. 984-87 (Moreno); R.T. 1154-55 (Willis); R.T. 1175-76 (R. Garza).  Bochicchio would pick up his payments at multiple locations, including the StaffPro offices   R.T. 1128-29 (Willis).

D.    The Builders Home Warranty Insurance Scam.

Count One's racketeering acts seven through nine (wire fraud), ten through twelve (mail fraud), and thirteen (money laundering) pertain to co-defendant Bochicchio's participation in the Builder's Home Warranty insurance scam.  Doc. 88 at 15-21.  This scam primarily enriched the deceased, Nick Brueggen, and later Bochicchio, but money also flowed to Mark Crawford and the other Family members to maintain their lifestyles and to fund their criminal activities.

The builder's home warranty insurance scam's main victims were the new home warranty customers of a company called Builder's Home Warranty ("BHW"), located in Englewood, Colorado.  R.T. 1763-67 (DeRocher).  BHW's business was to provide HUD-required home warranties to home builders to

13

protect new home buyers.  R.T. 1763-65.  On average, a builder would pay BHW about $300 per home for the new home buyer's warranty protection, which was supposed to cover the cost of fixing any workmanship problems that surfaced in the home.  *Id*.  BHW was not an insurance company.  Rather, HUD required it to contract with an insurance company to provide extra protection to the new home buyer.  R.T. 1765-66.  The insurance company received, on average, about half of the fee the builder paid to BHW.  *Id*.  BHW was to cover repairs costing up to $5,000; BHW's insurance company would cover repairs costing more than $5,000.  R.T. 1765.

Starting in 1993, Brueggen, doing business as "People's Insurance Company," began providing "insurance" coverage for BHW for the home warranties.  R.T. 1766-67.  Every month, BHW would overnight mail or wire transfer tens of thousands of dollars in insurance premiums from Colorado to Brueggen in Houston.  R.T. 1767-69.  By 1996, the payments were in the neighborhood of $60,000 per month.  R.T. 1768-69.  In addition, BHW also sent Brueggen a "consulting fee" amounting to ten percent of the monthly premiums.  R.T. 1770-71. Between 1993 and his murder on May 6, 1996, Brueggen collected roughly $673,000 from the BHW scam.  R.T. 1960-64 (Spjute); Government Exhibit ("GX") 5R.

Brueggen administered his "insurance business" with the

help of a CPA, James Knight, in Houston, Texas.  R.T. 1559-60
(Knight).  Payments and paperwork would come in to the CPA's
office from BHW.  Following Brueggen's instructions, Knight
and his staff would pay Brueggen's personal expenses, and
would stamp the insurance-related paperwork with a stamp
bearing the signature: Mulk Raj Dass.  R.T. 1633-36
(Hettenbach).  This same fictitious signature stamp was used
by Bochicchio and Mark Crawford for the operation of some of
the employee staff leasing businesses.  R.T. 1527-30
(Obenhaus).

Brueggen was not a licensed insurance agent, nor was he
affiliated with any real or legitimate insurance carrier.
*See* R.T. 1743-46 (Sherman).  The name under which he chose to
operate was in fact the name of a real insurance company,
affiliated with the large and reputable Progressive Casualty
Insurance Company.  R.T. 1721-24 (Schneider).  However,
Brueggen had nothing whatsoever to do with Progressive
Casualty, the real insurance company, the real affiliates of
which never did business in Colorado or Texas after 1990, and
never underwrote builder's home warranty insurance policies.
*Id*.  Regardless, Brueggen, and later Bochicchio, worked
actively to maintain the charade.  As the name of the real
insurance company changed over the years from "Peoples
Insurance Company" to "Pro West Insurance Company" to

15

"Progressive West Insurance Company," the name of the fake company in Texas changed with it.  R.T. 1722; R.T. 1914-15, R.T. 1926 (Garcia).  The phony companies never purchased insurance.

From 1993 through the beginning of 1996, most of the BHW insurance premium windfall apparently went to enrich Brueggen.  R.T. 1960-61 (Spjute); GX 5R.  Some of Brueggen's insurance premium income, however, also went to the Family. For instance, in late 1995, Brueggen wired $10,000 to Mark Crawford so that one of the Family's employee staff leasing companies, Unique Contracting, could meet its payroll.  R.T. 3857 (Recio).

E.   Bochicchio Becomes the Front Man.

In early 1996, Brueggen began to see the need for a front man for the BHW scam.  In January 1996, he received a letter from the United States Attorney's Office in the Eastern District of California informing him that he was a target of a grand jury investigation into Viking.  R.T. 2267 (Horne).  Because the federal authorities were focusing on Brueggen, it was decided that Bochicchio would put the phony BHW business in his name.  R.T. 2630 (Beckcom).  This meant, Bochicchio would play the same "front man" role he played for Mark Crawford's staff leasing companies.  *Id*.

In March of 1996, Brueggen brought Bochicchio to his

accountant's office and introduced Bochicchio as the person who would be taking over the insurance business.  R.T. 1574 (Knight); R.T. 1645 (Hettenbach).  Like Brueggen, Bochicchio had no insurance license and no connection whatever to any bona fide insurance carrier.  *See* R.T. 1745 (Sherman); R.T. 1721-24 (Schneider).  Bochicchio instructed the accountant to continue to use the "Mulk Raj Dass" (an unrelated person) signature stamp when paying the company's bills.  R.T. 1636 (Hettenbach).  From then on, Bochicchio was in frequent contact with the accountant's office, giving instructions.  *See* R.T. 1610-12 (Knight); R.T. 1645-52 (Hettenbach).  That same month, Brueggen also notified BHW that premiums were no longer to be sent to "Peoples Insurance Company," but instead to Peoples/BHW in care of Bochicchio.  *See* R.T. 1774-75 (DeRocher).

In late March 1996, Brueggen and Bochicchio incorporated, in the State of Texas, the fraudulent insurance company "People's BHW" and a holding company, Infinity Operations.  R.T. 1614-18 (Knight).  In April 1996, Bochicchio and Brueggen set up two new bank accounts in the name of Bochicchio's Peoples/BHW company, but to which Brueggen had access, at the First State Bank in Corpus Christi, Texas.  R.T. 1682-83 (Russell).  Bochicchio personally authorized the new accounts.  R.T. 1683.

1
2
3
4
5
6
7

Beginning in March or April of 1996, BHW, following Brueggen and Bochicchio's instructions, began sending BHW premiums to Bochicchio instead of directly to Brueggen.  R.T. 3784-85 (DeRocher).  At this point, Brueggen was still alive and had access to the accounts.  *See* R.T. 1682 (Russell).

8      F.   Conspiracy to Distribute Marijuana.

9
10
11
12
13
14
15
16
17

When the staff leasing companies of the Family began to have financial difficulties, Mike Beckcom suggested to Mark Crawford that they sell marijuana to make some extra cash. R.T. 2626-27 (Beckcom).  This discussion occurred in early 1996.  R.T. 2627, 2674.  During this same time, defendant Kirk Johnson was calling Mike Beckcom asking Beckcom for different drugs.  R.T. 2627.  Kirk Johnson also asked Beckcom if he knew of ways to make some extra money.  *Id.*

18
19
20
21
22
23
24
25
26
27
28

Mike Beckcom obtained thirty pounds of marijuana from a man in Houston for $17,500.  R.T. 2674-76.  He received delivery of the marijuana in a box from the man.  R.T. 2678. Inside the box, the marijuana was bundled into various weights.  R.T. 2679.  Mike Beckcom and Mark Crawford then sat down to decide how they were going to sell it.  R.T. 2680. They decided to drive it to New York.  R.T. 2681.  Mark Crawford and Beckcom drove the drugs to New York, where they contacted a man Beckcom knew.  R.T. 2681.  Beckcom's contact agreed to purchase the drugs for $800 per pound.  R.T. 2682.

Mark Crawford and Mike Beckcom met with the man in a hotel room and gave him a duffel bag containing 50 pounds of marijuana.  R.T. 2684.

Mark Crawford and Mike Beckcom then traveled to the Port Arthur, Texas, area to provide Kirk Johnson five pounds of the marijuana to sell for the Family.  R.T. 2627.  Kirk Johnson sold the marijuana and gave Mike Beckcom some of the proceeds from the sale.  *Id.*  Mike Beckcom also received money wired to him from New York as a result of the delivery of marijuana there.  *Id.*  When Beckcom received money from the sale of marijuana, he gave the money to the head of the Family, Mark Crawford.  R.T. 2628.

G.    Bankruptcy Fraud

In September of 1994, Mark Crawford, doing business as Superior Employee Staff Management, Inc. ("Superior"), filed a Chapter 11 bankruptcy petition in Texas.  R.T. 2022-23 (Wendlandt).  Chapter 11 allows a business to continue to operate under Bankruptcy Court protection while it pays off its debts, under the supervision of a trustee.  R.T. 2021.

At the time this bankruptcy petition was filed, the business owed the IRS more than $1 million in withholding taxes, penalties, and interest.  R.T. 2023.  When a business such as Superior files bankruptcy, the officers of the company become "debtors-in-possession."  R.T. 2025.  A

debtor-in-possession has a duty to operate the business in a reasonable manner so that the creditors of the business can receive a fair return on the amounts owed to them.  R.T. 2025-26.

A monthly operating report must be filed with the bankruptcy court, stating, under penalty of perjury, the amount of money the business has taken in, the expenses of the business, and the value of any assets.  R.T. 2027.  Mark Crawford submitted two monthly operating reports, one covering August-September, 1995, and another covering October-November, 1995.  R.T. 2028.  The reports were signed by Mark Crawford under penalty of perjury.  R.T. 2027.

On January 8, 1996, Mark Crawford testified at a hearing in U.S. Bankruptcy Court, Corpus Christi, Texas, concerning Superior's Chapter 11 petition.  R.T. 2029.  Petitioner admitted taking money earmarked for paying withholding taxes and using the funds to pay an insurance company.  R.T. 2031. He admitted that he paid the insurance company $2 million, the bulk of which came from diverted employee withholding taxes.  *Id*.

H.   The Kidnapping and Murder of Nick Brueggen.

In April 1996, defendant Mark Crawford learned that Nick Brueggen had met with federal authorities in Fresno.  *See* R.T. 2268 (Horne); R.T. 2634 (Beckcom).  He became enraged

20

that Brueggen was "snitching in California."  R.T. 2635
(Beckcom).   Mark Crawford said: "Nick's dead."  R.T. 2636
(Beckcom).

        In early May 1996, Bochicchio mentioned to his bank
teller in Corpus Christi that "some associates of his were
picking up a gentleman from the airport that was coming from
Houston...."  R.T. 1928 (Garcia).  On May 6, 1996, defendant
Mark Crawford told Mike Beckcom and defendant Kirk Johnson to
pick up Brueggen at the Corpus Christi airport when his
flight arrived from Houston.  R.T. 2637 (Beckcom).  For the
promise of $2,500 from Mark Crawford, Kirk Johnson agreed to
help.  R.T. 2638.  Beckcom and Johnson picked up Brueggen and
brought him to Mark Crawford's building at 561 Jacoby Lane.
R.T. 2641-42.  When they arrived at Jacoby Lane, the three
men got out of the car and entered the building.  R.T. 2643.
Beckcom and Johnson drew guns on Brueggen.  R.T. 2643-44.
Mark Crawford screamed at Brueggen:  "You fucked me, you
screwed my family.  You've fucked me for the last time.  You
are going to fix it today and you are leaving the country."
R.T. 2644.  Johnson kept Brueggen at gunpoint while Mark
Crawford and Beckcom went to Wal-Mart.  R.T. 2645-46.

        When Crawford and Beckcom returned to Jacoby Lane,
Crawford and Brueggen had a conversation about some
documents.  R.T. at 2647.  Brueggen told Crawford the

21

documents were in Houston.  *Id.*  Crawford indicated they were
going to retrieve the documents from Houston.  *See id.*
Crawford then took Brueggen's keys, and forced Brueggen to
get into a large toolbox (a "Jobox").  R.T. 2648.  Johnson
remained behind with Brueggen while Crawford and Beckcom went
to the Corpus Christi airport to purchase tickets to Houston.
R.T. 2648-49.  After making travel arrangements, Crawford and
Beckcom returned to Jacoby Lane.  R.T. 2649.  By then,
Johnson had let Brueggen out of the Jobox.  *Id.*  Crawford
became angry and made Brueggen get back into the box,
threatening:  "Get in the fucking box or I will pop a fucking
cap into you."  *Id.*  Brueggen got back into the box, and
Crawford closed the lid.  R.T. 2650.  It was extremely hot
in the building.

Mark and Beckcom then went to a Dairy Queen in Ingleside
to meet with Bochicchio.  R.T. 2650 (Beckcom).  As Beckcom
put it:

> We sat down and they had a conversation.  First
> Frank [Bochicchio] was kind of guarded.  I could
> tell that everyone was kind of nervous.  Crawford
> asked him – it was pretty much in relationship to a
> wire transfer that was expected into the account
> that Bochicchio had for Brueggen.

*Id.*  Later that afternoon, while Brueggen was still locked in
the Jobox, Bochicchio stopped by 561 Jacoby Lane, and Beckcom
introduced Bochicchio to Johnson.  R.T. 2652 (Beckcom).  "The
rat's in the trap," Mark Crawford told Bochicchio.  *Id.*

Bochicchio hugged Mark Crawford, then Bochicchio left. *Id.*

A short time later, Mark Crawford, Beckcom, and Kirk Johnson made a final trip to Wal-Mart, leaving Brueggen locked in the Jobox. At Wal-Mart the three picked up duct tape and a garden hose. R.T. 2653-55. When they returned to Jacoby Lane, Beckcom backed his Ford Explorer into the building, leaving it running. R.T. 2656 (Beckcom). Johnson taped one end of the garden hose to the Ford's exhaust pipe. *Id.* Mark Crawford taped the other end to the Jobox. *Id.* Mark Crawford and Johnson then together taped over all of the remaining air holes in the Jobox. R.T. 2656-57. They stacked debris on the Jobox to "dampen the noise" of Nick Brueggen's last moments. R.T. 2657. Mark Crawford, Beckcom, and Johnson then walked outside the building and made small talk while Brueggen was asphyxiated by the exhaust fumes. R.T. 2657-58 (Beckcom). After Brueggen was dead, Kirk Johnson took the "family" ring off Brueggen's hand at Mark Crawford's request. R.T. 2661-62.

A few days after the murder, Mark Crawford instructed Mike Beckcom to give Kirk Johnson the "Family" ring formerly worn by the man Johnson helped murder. R.T. 2625, 2663-64 (Beckcom). "Welcome to the Family," Mark Crawford told Johnson. R.T. 2625, 2663-64. Johnson accepted the ring. *See* R.T. 2437.

About a month later, on June 6, 1996, Brueggen's body was found in a shallow grave behind 561 Jacoby Lane.  R.T. 2466-69 (Rivera).  On hearing that the body had been found, Bochicchio told Beckcom, "Yeah, that's Mark's problem -- I told him not to bury him there."  R.T. 2665 (Beckcom).

After the body was found, Mark Crawford became a fugitive.  He left Texas and abandoned his red Mercedes in New Orleans.  R.T. 2808 (Bates).  In the car, Mark Crawford left behind BHW correspondence between Brueggen and BHW CEO Andrew Jelonkiewicz.  R.T. 2810-11 (Bates); GX 8C-1 and 8C-2.

Mark Crawford was arrested in Mississippi on July 13, 1996.  R.T. 2831-32 (Kerley).  He had a disguise, which included a woman's wig and clothing.  R.T. 2833-34.  In the mobile home where Crawford was arrested, officers found a blue notebook containing Mark Crawford's inculpatory statements concerning the kidnapping of Nick Brueggen.  R.T. 2834-37.

I.   Bochicchio's Continued Maintenance of the Scams.

At the same time that Mark Crawford was bestowing his "family" ring upon Kirk Johnson, a few days after Nick Brueggen's murder but before his body was found, Bochicchio transferred the Peoples/BHW and Infinity Operations bank accounts again, this time to accounts in Corpus Christi over which Brueggen had no control.  R.T. 1885-86.  Starting a few

days later, Bochicchio made a series of large withdrawals from the account.  On May 18, 1996, he made two cash withdrawals, for $7,206.38 and $3,245, respectively.  R.T. 1888-89; Government's Exhibits 5W-3, 5W-4.  The very next day, he withdrew $8,463 in cash.  R.T. 1889; Government's Exhibit 5W-5.  About eleven days later, on May 31, 1996, he withdrew $8,846 in cash.  R.T. 1889; Government's Exhibit 5W-6.  On May 15, 1996, Bochicchio also took out a loan for $10,000 against a certificate of deposit he had purchased with BHW premium money.  R.T. 1890-92; GX 5W.

Meanwhile, insurance premium money continued to flow in from Colorado.  From 1996 through 1998, Bochicchio took in over $2.2 million in BHW premium funds.  R.T. 1964 (Spjute); Government's Exhibit 5R; R.T. 1898-1900 (Garcia).  Bochicchio used the money for personal items, to purchase real property in the Corpus Christi area, buy certificates of deposit, and obtain cash.  R.T. 1965 (Spjute); R.T. 1905-1922 (Garcia).  At no time did Bochicchio ever engage in any insurance related activities, home warranty or otherwise.  *See* R.T. 1900-03 (Garcia).  However, Bochicchio from time to time mailed letters on fake letterhead, sometimes with forged signatures, to Colorado to keep the money coming.  *See, e.g.,* R.T. 1902-04 (Garcia); R.T. 1965 (Spjute), 1969-79 (listing various forged documents purporting to show existence of an

insurance business, found during a search warrant executed at Bochicchio's residence).  Also, Bochicchio, from time to time, changed the name of his "insurance company" to correspond to the name changes of the real insurance company. *See, e.g.,* R.T. 1914-15 (Garcia) (accounts in the dba name "Peoples Pro West" opened); R.T. 1926 (Garcia) (company now referred to as "Progressive Insurance Company"); *see also* R.T. 1722 (Schneider) (listing name changes of the real company).

J.    <u>State Murder Trials.</u>

     May served as Petitioner's trial counsel in both state trials.[3]  Mark Crawford was tried twice in the State of Texas for his involvement in the murder of Nick Brueggen.  The first trial ended in a hung jury; the second in acquittal.

K.    <u>Federal Indictment.</u>

     Mark Crawford and numerous other members of the Family were indicted in the Eastern District of California on May 30, 1996 on multiple felony charges related to the racketeering enterprise and the kidnapping and murder of Nick

─────────────

     [3] Bill May graduated from the University of Texas Law School in 1978, and was in private practice briefly before joining the Nueces County District Attorney's Office in 1979. May 2/20/04 Depo.  He remained at the District Attorney's Office until 1988, after which he again took up private practice. *Id*.  He has tried between 300-500 criminal cases, prosecuted three capital cases as a deputy district attorney, and defended two capital cases while in private law practice. *Id*.

26

Brueggen.  1:96-cr-5127 Docs. 1, 24, 88.  On July 23, 1998,
the grand jury returned a second superseding indictment
alleging the following charges:

| Count | Defendant | Charge |
|---|---|---|
| 1 | Mark E. Crawford,<br>Frank R. Bochicchio,<br>John R. Crawford,<br>David Franco, Jr.,<br>Kirk A. Johnson,<br>Juan P. Galvan | Racketeering –<br>18 U.S.C. § 1962 |
| 2 | Mark Crawford<br>Bochicchio<br>John Crawford<br>Franco<br>Johnson<br>Galvan | Racketeering Conspiracy –<br>18 U.S.C § 1962(d) |
| 3 | Mark Crawford<br>Bochicchio<br>Johnson | Murder in Aid of Racketeering –<br>18 U.S.C. § 1959(a)(1) |
| 4 | Mark Crawford<br>Bochicchio<br>Johnson | Kidnapping in Aid of Racketeering –<br>18 U.S.C. § 1959(a)(1) |
| 5 | Mark Crawford<br>John Crawford<br>Harry E. Clift | Conspiracy –<br>18 U.S.C. § 371 |
| 6 | Mark Crawford<br>John Crawford<br>Clift | Embezzlement from an Employee Welfare Benefit Plan –<br>18 U.S.C. § 664 |
| 7-13 | Mark Crawford<br>John Crawford<br>Clift | Wire Fraud –<br>18 U.S.C. § 1343 |
| 14-16 | Mark Crawford<br>John Crawford<br>Clift | Money Laundering –<br>18 U.S.C. § 1956 |
| 17 | Mark Crawford | Obstruction of Justice by Killing a Witness – 18 U.S.C. § 1512(a)(1)(C) |

27

| Count | Defendant | Charge |
|-------|-----------|--------|
| 18 | Mark Crawford | Obstruction of Justice by Retaliation against a Witness (Murder) – 18 U.S.C. § 1513(a)(1)(B) |
| 19 | Mark Crawford | Threatening to Commit a Crime of Violence against an Individual – 18 U.S.C. § 1959 |
| 20 | Mark Crawford | Perjury before a Grand Jury – 18 U.S.C. § 1623 |
| 21 | Mark Crawford | Perjury before a Grand Jury – 18 U.S.C. § 1623 |
| 22 | Mark Crawford | Perjury before a Grand Jury – 18 U.S.C. § 1623 |
| 23 | John Crawford | Perjury before a Grand Jury – 18 U.S.C. § 1623 |
| 24 | Bochicchio | Perjury before a Grand Jury – 18 U.S.C. § 1623 |
| 25 | Bochicchio | Perjury before a Grand Jury – 18 U.S.C. § 1623 |
| 26 | Franco | Perjury before a Grand Jury – 18 U.S.C. § 1623 |
| 27 | Franco | Perjury before a Grand Jury – 18 U.S.C. § 1623 |
| 28 | Mark Crawford Bochicchio John Crawford Johnson Galvan | Criminal Forfeiture – 18 U.S.C. § 1963 |

Doc. 88.

Count One of the second superseding indictment charged the following predicate racketeering acts:

| RICO Act | Defendant | Charge |
|---|---|---|
| 1 | Mark Crawford<br>John Crawford | Embezzlement – 18 U.S.C. § 644 |
| 2 | Mark Crawford<br>John Crawford | Wire Fraud – 18 U.S.C. § 1343 |
| 3 | Mark Crawford<br>John Crawford | Money Laundering –<br>18 U.S.C. § 1956(a)(1)(B)(i) |
| 4 | Mark Crawford<br>John Crawford | Money Laundering Conspiracy –<br>18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(h) |
| 5 | Mark Crawford<br>Johnson | Conspiracy to Distribute Marijuana –<br>21 U.S.C. §§ 846, 841(a)(1) |
| 6 | Mark Crawford<br>Bochicchio<br>Johnson | Kidnapping and Murder –<br>Tex. Penal Code Ann. §§ 7.01, 7.02,<br>19.02(b)(3), 19.03(a)(2), 20.04 |
| 7-9 | Bochicchio | Wire Fraud – 18 U.S.C. § 1343 |
| 10-12 | Bochicchio | Mail Fraud – 18 U.S.C. § 1341 |
| 13 | Bochicchio | Money Laundering –<br>18 U.S.C. § 1956(a)(1)(B)(i) |
| 14 | Mark Crawford<br>Bochicchio<br>John Crawford<br>Galvan<br>Franco | Wire Fraud – 18 U.S.C. § 1343 |
| 15 | Mark Crawford<br>Bochicchio<br>John Crawford<br>Galvan<br>Franco | Money Laundering –<br>18 U.S.C. § 1956(a)(1)(B)(i) |
| 16 | Mark Crawford<br>Bochicchio<br>John Crawford<br>Galvan<br>Franco | Money Laundering Conspiracy –<br>18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(h) |
| 17 | Mark Crawford | Bankruptcy Fraud – 18 U.S.C. § 1962(d) |

*Id.*

On July 27, 1998, defendant Mark Crawford was arraigned on the second superseding indictment and pleaded not guilty. Doc. 103.

L.   <u>Petitioner's Representation During the Federal Trial.</u>

Fresno Attorney E. Marshall Hodgkins was initially appointed by the district court to represent Crawford in the federal case.   Crawford specifically requested that May be appointed to represent him as well.   Doc. 55.   At a hearing on March 3, 1998, Hodgkins represented that, in his 20 years of practice, this was "the most complex case ... [he had] ever handled."   Petitioner's Reply, Doc. 7, Exhibit ("PRX") 15 at 4.   Hodgkins also requested that May be appointed co-counsel.   May agreed to serve as lead counsel, with Hodgkins serving the function of local counsel.   *Id.* at 6.   May agreed, representing that he knew "so much about the case, it would take forever for me to tell anyone else everything I know about it...."   *Id.* at 6-7.   May was appointed "attorney of record" and "trial counsel," while Hodgkins was appointed "local counsel" to "assist May at his direction."   PRX 16 at 1-3, 5, 7.

In March 1999, Hodgkins withdrew as counsel for Crawford.   *See* Doc. 250.   In April 1999, approximately two

months before trial, Roger Litman was appointed to replace Hodgkins.  PRX 3, Litman 6/20/03 Depo., at 6-7.  Litman was wary of accepting an appointment in such a complicated case so close to trial, but May told him "not to worry about having enough time to get up to speed because the case was going to be continued...."  *Id.* at 7-8.  Litman accepted the appointment in large part based on May's assurance that the trial was going to be continued.  *Id.* at 8.

On June 7, 1999, a few weeks prior to the scheduled trial, the district court held a hearing to consider motions in limine.  May failed to appear.  Litman relayed to the court a telephone conversation he had with May that morning in which May had said that because of May's financial situation, "there is no way [May] could be [in Fresno] for two or three months, having to pay the hotel, having to pay for the ongoing operation of his office in Corpus Christi without, and the words he use were, 'going broke.'"  PRX 21, Reporter's Transcript of 6/7/99 Proceedings, at 16.  May also told Litman that even "assuming the housing situation could be worked out so that he wasn't in a position where he was going to be going broke, that [May] felt that he could not be fully prepared to represent Crawford without a 30-day continuance of the trial."  *Id.* at 22.  The request for a continuance was denied.  *Id.* at 22.

This left Litman with, in his opinion, insufficient time
to adequately prepare for trial:

> [W]hen I got onboard, Mr. May had assured me the
> case was going to be continued, and I'd have
> sufficient time to be properly prepared .... And in
> fact, when he sent me in there, I'll say as his
> sacrificial lamb, to make and unsupported request
> for a continuance, that was ... I won't say
> summarily rejected, but rejected and denied by the
> court because it was without legal or factual basis,
> um ... I started wondering, what am I getting into.

PRX 5, Litman 2/24/06 Depo., at 173.  Litman believes that he
was "duped" by May on the issue of the continuance.  *Id*. at
175.  Litman did not raise his concerns about inadequate time
to prepare with the court nor with anyone else.  By then, the
case had been pending for three years, and May had been in
the case as attorney of record for over one year and three
months.

M.   <u>Disposition of the Federal Trial.</u>

The jury trial began on June 23, 1999.  Doc. 368.  On
August 20, 1999, the jury convicted Petitioner of
racketeering, racketeering conspiracy, murder in aid of
racketeering, kidnapping in aid of racketeering, conspiracy,
embezzlement from an employee welfare benefit plan, six
counts of wire fraud, three counts of money laundering,
obstruction of justice by killing a witness, obstruction of
justice by retaliation against a witness (murder),
threatening to commit a crime of violence against a witness,

and three counts of perjury.  Doc. 462.  Defendant Kirk

Johnson was convicted of four counts: racketeering,

racketeering conspiracy, murder in aid of racketeering, and

kidnapping in aid of racketeering.  Doc. 458.  Co-defendant

John Crawford was convicted of 14 counts, including

racketeering, racketeering conspiracy, wire fraud, money

laundering and perjury before a grand jury.  Doc. 460.  Co-

defendant Frank Bochicchio was convicted of 3 counts,

including racketeering, racketeering conspiracy and perjury.

Doc. 456.  Co-defendant Juan Galvan was acquitted.  Doc. 464.

Petitioner, Johnson, Bochicchio, and John Crawford appealed.

Docs. 561, 716, 721, 750.  All convictions were affirmed by

the Court of Appeals.

On June 19, 2000, Crawford was sentenced to life

imprisonment and was ordered to pay restitution in the amount

of $1.2 million.  *See* Doc. 715.

IV.   <u>STANDARD OF DECISION.</u>

To establish an ineffective assistance of counsel claim,

Petitioner must show: (1) the representation was deficient,

falling "below an objective standard of reasonableness"; and

(2) the deficient performance prejudiced the defense.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Bell v.

Cone*, 535 U.S 685, 695 (2002) (both deficient performance and

prejudice to defendant required to render the result of a

33

proceeding unreliable).  The Court need not evaluate both prongs of the Strickland test if the petitioner fails to establish one or the other.  *Strickland*, 466 U.S. at 697; *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1294 n.38 (9th Cir. 2005).

Under the first prong, Petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.  "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Id*. at 690.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct of counsel's performance at the time."  *Id*. at 689.  The proper inquiry is whether, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  *Id*.  The court must apply "a heavy measure of deference to counsel's judgments," and "must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance."  *Id*. at 690-

**34**

691.  "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  *Id.* at 689.  "The relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable."  *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1988).

A decision to waive or not pursue an issue where there is little or no likelihood of success and concentrate on other issues is indicative of competence, not ineffectiveness.  *See Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).  Similarly, while a lawyer is under a duty to make reasonable investigations, counsel may make a reasonable decision that particular investigations are unnecessary.  *Strickland*, 466 U.S. at 691.  Trial counsel are also permitted wide discretion in their tactical decisions.  *See United States v. Ferreira-Alameda*, 815 F.2d 1251, 1254 (9th Cir. 1986); *United States v. Appoloney*, 761 F.2d 520, 525 (9th Cir. 1985).  A court must measure counsel's conduct in light of all the circumstances and from counsel's perspective at the time of trial.  *Id.* at 688-89.

To meet the prejudice requirement, the petitioner must

demonstrate that errors "actually had an adverse effect on the defense." *Strickland*, 466 U.S. at 693.  "It is [also] not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* "Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.*  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.* at 694.

## V.   ANALYSIS

### A.   Credibility Issue.

During the course of the federal trial, May submitted three Criminal Justice Act ("CJA") forms, on September 30, 1998, January 23, 1999, and September 22, 1999.  The amounts claimed on those forms were $29,067.76, $10,033.00, and $62,164.64, respectively, for a total of $101,265.40, as payment for May's time (at $75.00/hour) and reimbursement for pre-trial and trial expenses.  On each of those forms, May checked "No" in a box that asks: "Has the person represented paid any money to you, or to your knowledge to anyone else,

in connection with the matter for which you were appointed to provide representation."  Doc. 937-2, 937-3 & 937-4.

It is undisputed that at the time May applied for CJA funds as appointed counsel, Petitioner's son-in-law, Tom Henry, was lending May $7,500.00 a month plus additional funds to upgrade his hotel room to accommodate court files. PRX 1, May 2/20/04 Depo., at 61.  May asserts that he informed the court administrator's office of the arrangement with Henry.  *Id*. at 61-62.

Petitioner argues that May's "false representations" to the court on the CJA forms undermine May's credibility.  May maintains that he did not advise the court of these payments on the CJA forms because "those were loans."  May 10/31/05 Depo. 67.  Henry confirms that he and May had an understanding that "May would pay [him] back after trial." PRX 7, T. Henry Aff.  May, who eventually declared bankruptcy, admits that he has never repaid any of these loans, but does not disclaim Henry's right to collect.  May 10/31/05 Depo., at 65, 67.  There was no quid pro quo understanding between May and Henry that the loans would not be repaid and Henry has not said otherwise.  These were not "under the table" payments for May's representation of Crawford.  May's conduct in connection with the CJA submissions and the loans from Henry do not undermine his

credibility.

B.   <u>Tactical Decisions of Counsel.</u>

Three of Petitioner's arguments can be described as challenges to tactical decisions made by May during the federal trial.  Petitioner contends that May was ineffective because he (1) failed to call William Noel as a witness; (2) failed to offer Petitioner's son's school attendance records at trial; and (3) failed to object to the prosecutor's reference to Petitioner's son's school attendance in closing argument.

The government maintains that these decisions were "tactical trial decisions" which, as exercises of trial strategy, cannot form the basis of an ineffective assistance of counsel claim under a long line of precedent.  *Mancuso v. Olivarez*, 292 F.3d 939, 954 (9th Cir. 2002) (failure to present evidence to a jury does not amount to ineffective assistance so long as counsel's decision is strategically reasonable); *La Grande v. Stewart*, 133 F.3d 1253, 1275 (9th Cir. 1998) (failure to cross-examine witnesses does not necessarily amount to ineffective assistance so long as the decision is reasonable); *Clabourne v. Lewis*, 64 F.3d 1373, 1383 (9th Cir. 1995) (explaining that counsel's failure to request a "voluntariness instruction" to the jury for an insanity defense amounted to a tactical decision and does not

constitute ineffective assistance); *United States v. Ferreira-Alameda*, 815 F.2d 1251, 1254 (9th Cir. 1986)(counsel's stipulation to facts unknown to him and failure to object to evidence does not necessarily demonstrate ineffective assistance); *United States v. Appoloney*, 761 F.2d 520, 525 (9th Cir. 1985) (explaining that counsel's failure to raise objections on some issues is not deficient performance and may be seen as reasonably strategic).

1.   Testimony of William Noel.

Petitioner's primary contention is that May's failure to call William Noel as a witness in the federal trial was ineffective assistance.   Petitioner maintains that this failure was compounded by May's opening statement, which stated that Noel would provide critical testimony.

a.   Sufficiency of Performance.

Failure to produce a witness promised in opening statement may constitute ineffective assistance of counsel, if the promise was sufficiently "specific and dramatic" and the evidence omitted would have been significant.   For example, in *Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir. 1988), petitioner stabbed his estranged wife numerous times after finding her with another man.   The jury had to determine whether petitioner committed first degree murder,

second degree murder, or manslaughter.  *Id*.  During opening
statements, Defense counsel told the jury that he would call
a psychiatrist and a psychologist, whose testimony would show
that defendant was "walking unconsciously toward a
psychological no exit.... Without feeling, without any
appreciation of what was happening ... on that night [he] was
like a robot programmed on destruction."  *Id*.  This statement
was based upon the doctors' reports possessed by counsel, who
were available to testify.  *Id*.  Nevertheless, the defense
rested the next day without calling the doctors.  In his
closing, counsel acknowledged the omission:

> And I have been sitting and listening with you as
> the facts have been presented in this case, and I
> had intended to try and persuade you with fancy
> medical and clinical terminology. But there is no
> amount of psychiatric and psychological evaluations
> that were going to present a better picture of what
> you have already heard. Why should you hear this
> evidence again from people who presume to know Bruce
> Anderson better than those who really do know him
> and testified what they already know? At this point
> was it really necessary for me to try and impress
> you?

*Id*.  Petitioner was convicted of first degree murder.

    The First Circuit noted that, "little is more damaging
than to fail to produce important evidence that had been
promised in an opening":

> This would seem particularly so here when the
> opening was only the day before, and the jurors had
> been asked on the voir dire as to their acceptance
> of psychiatric testimony. The promise was dramatic,
> and the indicated testimony strikingly significant.

> The first thing that the ultimately disappointed
> jurors would believe, in the absence of some other
> explanation, would be that the doctors were
> unwilling, viz., unable, to live up to their
> billing. This they would not forget.

*Id.*  Such circumstances were found to be "prejudicial as a
matter of law."  *Id.* at 18.

Similarly, in *Ouber v. Guarino*, 293 F.3d 19 (1st Cir.
2002), counsel promised four times in his opening statement
that defendant would testify, and stated that defendant's
testimony would be central to the case:

> The case is going to come down to what happened in
> that car and what your findings are as you listen to
> the credibility and the testimony of Todd Shea
> versus what your findings are as you listen to the
> testimony of [defendant] Barbara Ouber.

*Id.* at 22.  On the evening of the first day of trial, counsel
persuaded the defendant not to testify.  *Id.* at 24.  The
First Circuit described the error attributed to counsel as
consisting of "two inextricably intertwined events: the
attorney's initial decision to present the petitioner's
testimony as the centerpiece of the defense (and his serial
announcement of that fact to the jury in his opening
statement) in conjunction with his subsequent decision to
advise the petitioner against testifying."  *Id.* at 27.

The First Circuit rejected the government's argument
that defense counsel's actions were reasonable strategic
choices:

41

1

2          Under ordinary circumstances, that is true. It is
           easy to imagine that, on the eve of trial, a

3          thoughtful lawyer may remain unsure as to whether to
           call the defendant as a witness. If such uncertainty

4          exists, however, it is an abecedarian principle that
           the lawyer must exercise some degree of

5          circumspection. Had the petitioner's counsel
           temporized-he was under no obligation to make an

6          opening statement at all, much less to open before
           the prosecution presented its case, and, even if he

7          chose to open, he most assuredly did not have to
           commit to calling his client as a witness-this would

8          be a different case. *See Phoenix v. Matesanz*, 233
           F.3d 77, 85 (1st Cir. 2000) (finding no

9          ineffectiveness where, in the absence of an express
           promise, counsel chose not to call a potentially

10         important witness).

11
           Here, however, the circumstances were far from
12         ordinary. The petitioner's counsel elected to make
           his opening statement at the earliest possible time.
13         He did not hedge his bets, but, rather, acted as if
           he had no doubt about whether his client should
14         testify. In the course of his opening statement, he
           promised, over and over, that the petitioner would
15         testify and exhorted the jurors to draw their
           ultimate conclusions based on her credibility. In
16         fine, the lawyer structured the entire defense
           around the prospect of the petitioner's testimony.
17

18         In the end, however, the petitioner's testimony was
           not forthcoming. Despite the fact that the lawyer
19         had called the petitioner to the stand in both prior
           trials, he did a complete about-face. The lawyer
20         states in his affidavit that he only realized that
           keeping his client off the witness stand was an
21         option after the first day of trial. This
           realization came much too late. Indeed, the
22         attorney's delayed reaction is sharply reminiscent
           of the situation in Anderson, in which we observed
23         that even "if it was ... wise [not to have the
           witness testify] because of the damaging collateral
24         evidence, it was inexcusable to have given the
           matter so little thought at the outset as to have
25         made the opening promise.
26

27
   *Id*. at 28-29.  "Taken alone, each of [counsel's] decisions,"
28

emphasizing defendant's testimony during the opening statement and convincing defendant not to testify, "may have fallen within the broad universe of acceptable professional judgments. Taken together, however, they are indefensible." *Id*. at 27.

The Seventh Circuit found ineffective assistance in *Harris v. Reed*, 894 F.2d 871, 873-74 (7th Cir. 1990), a murder case in which two eye witnesses identified someone other than defendant running away from the scene of the crime.  That individual became the prime suspect until more than a month after the shooting, when another informant indicated that he heard the gunshot and then saw the defendant run to his car, get inside, and drive away.  *Id*. at 873.  This informant was the only witness connecting defendant to the murder scene.  Defense counsel told the jury about the eye witnesses and the other suspect during opening statement, but, without having interviewed the eye-witnesses or consulting with defendant, counsel decided not to call either eye witnesses during the trial.  *Id*. at 874.

The Seventh Circuit found that the eye witnesses' impartial testimony would have been credible and significant, in that it would have discredited the informant's version of the event.  *Id*. at 877-78.  Counsel offered no strategic reasons for not calling these witnesses.  *Id*. at 878.  Under

43

the circumstances, the Seventh Circuit concluded that
"counsel's overall performance, including his decision not to
put on any witnesses in support of a viable theory of
defense, falls outside the wide range of professionally
competent assistance."  *Id.*  *Harris* found prejudice in
counsel's decision to rest without presenting the eye
witnesses to support the alternative suspect theory.  This
"left the jury free to believe [the informant's] account of
the incident as the only account.  In fact, counsel's opening
primed the jury to hear a different version of the incident.
When counsel failed to produce the witnesses to support his
version, the jury likely concluded that counsel could not
live up to the claims made in the opening."  *Id*. at 879.

     In contrast, where the promise is more general in
nature, and/or where the testimony to be provided would not
be significant or was elicited through other means, courts
may defer to counsel's reasonable decision to change course.
For example, in *United States v. McGill*, 11 F.3d 223, 227
(1st Cir. 1993), defense counsel told the jury during his
opening that he would call a firearms expert.  Counsel later
decided not to call the expert after learning he could be
easily impeached.  *Id*.  In addition, counsel "succeeded, by
dint of skillful cross-examination of the prosecution's
firearms expert, in eliciting much the same opinion evidence

44

that he hoped to establish through his own expert." *Id.; see also Yeboah-Sefah v Ficco*, 556 F.3d 53, *77-78 (1st Cir. 2009) (no ineffective assistance where counsel's general promise that jury would hear from "psychologists and psychiatrists... about the medical affects [sic] of [petitioner's] medication" was not an explicit promise to produce a particular witness, and psychologist and psychiatrist did testify (for the government) about petitioner's medications and his mental capacity at the time of the crime); *United States ex rel. Schlager* v. Washington, 887 F. Supp. 1019, 1026-27 (N.D. Ill. 1995), aff'd, 113 F.3d 763 (7th Cir. 1997) (even though counsel indicated during opening that defendant would testify, counsel and client's reasonable strategic decision to withhold such testimony did not amount to ineffective assistance).

Whether May acted appropriately is evaluated by the nature of the promise(s) made during his opening statement. Crawford's principal defenses to the murder charge were (1) that Crawford had an alibi and (2) that a key government witness, Mike Beckcom, framed Crawford.  PRX 23, M. Crawford's Opening Statement, at 258:23-259:4 ("Mark Crawford couldn't have killed Nick Brueggen because he wasn't on Jacoby Lane.... In addition to that, we are going to show you that Mike Beckcom is part of a scheme to frame Mark

Crawford.").  In opening, May discussed William Noel's

connection to these defenses:

> What else are we going to show you? Well, very
> important testimony is going to come from a man
> named William Noel, and this is a person that was
> arrested the same night the body of Nick Brueggen
> was found. How does this tie in? When William Noel
> was arrested, he had with him a briefcase and in the
> briefcase was Nick Brueggen's wallet, his checkbook,
> a lot of personal items and all the things that were
> supposedly on Nick Brueggen when he would have been
> murdered. It's all in William Noel's possession.
> William Noel is arrested after he excites the ire of
> a neighborhood dog.
>
> William Noel an hour earlier had gone to the police
> station and asked, 'Where is Mark Crawford's house,
> how do I get there?' Noel is given instructions
> because, remember, Mark Crawford was the mayor and
> the police would have known where he lived. He's
> headed in the direction of Mark Crawford's house.
> He's got a briefcase with him with all of Nick
> Brueggen's possessions in it. And when William Noel
> gets arrested, he's questioned by police. The police
> let him go as a result of his agreement to cooperate
> against Mark Crawford.
>
> His first story he tells he recants, then changes
> the story again.  He gets called as a witness by
> Mark Crawford, by the state once, and he's called on
> the second occasion. On the second occasion that Mr.
> Noel is called as a witness, and Mr. Noel will be
> here as a witness in court, Noel will tell you that
> the reason that he had the briefcase that night is
> because Mike Beckcom called him on the phone, told
> him to come over there and get the briefcase and
> told him to go plant the briefcase at Mark
> Crawford's old house so that whenever the body is
> recovered – remember the body is getting recovered
> on this same night, the news media is already out
> there, it's already on the news – Mr. Noel – or at
> least you could drive by and see that there is news
> media and everything, Mr. Noel, pursuant to Mike
> Beckcom's instructions, was taking the briefcase
> over to Mark Crawford's house to plant the last
> piece of evidence to put together the murder frame

on Mark Crawford.

> Noel testifies that, in fact, Beckcom planned to
> kill Nick Brueggen and we can ask, you know – and
> William Noel, incidentally, is no angel. He's [sic]
> certainly is an ex convict.  He's currently in
> prison for a terrible rape that he committed after
> he was released by law enforcement and after he
> agreed to testify against Mr. Crawford, but he has
> important testimony about his involvement with Mark
> Crawford. So when I say Mark Crawford was framed, at
> least one of the witnesses will testify that he
> participated in that conspiracy to frame him.

*Id*. at 262:14-264:8.  This is a specific, and lengthy

description that Noel would be a witness.  It suggests that

Noel would testify in support of the defense theory that Mark

Crawford was framed for the murder.  *Compare Anderson*, 858

F.2d at 17 ("dramatic" promise of "strikingly significant"

evidence) *with McAlesse v. Mazurkiewicz*, 1 F.3d 159 (3rd Cir.

1993) (opening was "carefully worded recitation of evidence

the defendant <u>did</u> produce")(emphasis added).

Nevertheless, May did not subpoena Noel, who never

testified in the federal trial.  Why, then, did May mention

Noel in his opening statement?  As a general rule, failing to

call a witness will not amount to ineffective assistance of

counsel if the decision is a reasonable tactical choice based

on adequate inquiry.  *Gerlaugh v. Stewart*, 129 F.3d 1027,

1033 (9th Cir. 1997) (failure to call three witnesses who

could have related mitigating sentencing evidence was a

reasonable tactical decision; counsel reasonably believed

47

testimony could backfire).  However, an attorney's basis for not calling a witness can be unreasonable if it is not supported by objective evidence.  *Alacala v. Woodford*, 334 F.3d 862, 871 (9th Cir. 2003).

May maintains that he expected Noel would be a government witness.  PRX 1, May 2/20/04 Depo., at 49-50.  May also explains that he made up his mind _not_ to call Noel after the conclusion of Mark Crawford's San Antonio trial.  PRX 2, May 11/31/05 Depo., at 98.  However, objective evidence contradicts May's asserted belief that the government would call Noel as a witness.  Noel was not on the government's pretrial witness list, PRX 22, nor did the government mention Noel in its opening statement.  In contrast, Noel _was_ on the internal defense witness list prepared at May's direction by the investigator appointed for Crawford.  PRX 6 ¶¶ 4-5 & Exh. 6(B), at 5 (D. Cordis Aff.).  This defense witness list was prepared _after_ May gave his opening statement.  *Id*.

At the same time, May's assertion that he _never_ intended to call Noel as a witness in the federal trial is supported by significant objective evidence.  Noel arguably provided some exculpatory testimony at Crawford's state murder trial.  Specifically, Noel testified that Beckcom instructed Noel to leave Brueggen's briefcase at Mark Crawford's house.  PRX 28, W. Noel's Dec. 1997 testimony in *Texas v. Crawford*, A-96-

48

0062-CR, at 1217-1218.   Further, Noel testified in the state trial that Noel himself had wanted to kill Nick Brueggen, and that, upon learning this, Mark Crawford got "kind of upset" with Noel.   *Id*. at 1178-1181.   Noel signed a statement indicating that he would have testified to these facts in the federal trial if he had been subpoenaed.   PRX 10, W. Noel statement.

It is indisputable, however, that Noel had serious credibility problems as a witness in the state trials, credibility problems that undoubtedly would have been emphasized and exploited by the prosecution in the federal trial.   During the first and second state court trials, Noel was a witness for the state <u>against</u> Petitioner.   GX A, May 2/20/04 Depo., at 7-8.   During cross-examination of Noel by May in the second state trial, Noel stated that if May "paid him enough money, he would have testified for Crawford rather than the State of Texas," *id*. at 8, confirming his testimony was for sale to the highest bidder.   May stated at his February 20, 2004 deposition:

> Mr. Noel was an extraordinary witness in a - in that trial.   He just basically got up there and said he testified for the highest bidder, whoever that would have been.
>
> So, when we began the trial in California, in opening statement I wanted the jury to know about what it was that was said by - or said by Noel to the detectives and, more particularly, the circumstances of Mr. Noel's apprehension with the

1    briefcase of Mr. Brueggen.

2    Calling Mr. Noel as a witness myself was never an
3    option. He had written a letter to Mr. Crawford that
     I had seen in which Mr. Noel asked me to go to the
4    prison to tell him what he was supposed to say in
5    the trial so he could be a good defense witness for
     Mr. Crawford.
6
     And, obviously, I didn't feel like I could
7    truthfully put Mr. Noel on the stand as a witness
     without suborning perjury, so I ruled him out as a
8    witness.  And I had made that decision really at the
9    beginning of the trial, that I would never call Noel
     as a witness.
10
     Q.  Alright.  Did you communicate these - your
11   concerns to Mr. Crawford?

12   A.  Yes, I did.

13   Q.  Was this before the trial or during the trial or
14   -

15   A.  It was actually both.  We discussed subpoenaing
     him to get him down there for the trial, and I
16   explained to him the things - I just said it now and
17   told him that I would never call Noel as a witness
     because of the perjury problem.  I didn't think Noel
18   would tell the truth."

19   GX A, at 8-9.  Defense counsel had an ethical duty not to

20   call a witness whose testimony he knew would be perjurious.

21   Noel had already testified inconsistently for and against

22   Mark Crawford in state court, and fatally compromised his

23   believability by confirming his testimony was for sale.

24
25        Noel wrote a letter to prosecutors prior to the federal

26   trial in which he expressly implicated Crawford in the murder

27   of Nick Brueggen.  GX D, 1:02-cv-06498, Doc. 4-5.  In the

28   letter, Mr. Noel outlined the structure of "The Family" and

Mark Crawford's role in the murder of Nick Brueggen.  This letter was produced in pre-trial discovery and reviewed by Mr. May.

In addition, Noel had prior felony convictions, including an aggravated rape conviction after he was released from prison as a cooperating witness to testify for the state against Petitioner.

Petitioner emphasizes that Mr. Litman had a very different understanding of the defense team's plans with respect to calling Noel as a witness:  "It was a given all along that Mr. Noel would be called, and I was under the belief that Mr. Noel was going to testify as a witness for Mr. Crawford."  PRX 3, Litman 6/20/03 Depo., at 23-24. During Mr. Litman's trip to Corpus Christi to prepare for trial, Mr. May emphasized the importance of Mr. Noel's testimony to Mr. Litman: "[W]hen I went to Corpus Christi, it was pointed out to me by Mr. May that [Noel] was an important witness. And when I was reading the transcripts from the state trial, that -- he was one of the witnesses whose testimony I made sure that I could locate and -- and read that."  PRX 5, Litman 2/24/06 Depo., at 221.  Litman recalls that Mr. May directly and consistently asserted that Noel was "an important witness for Crawford" who "would be called." PRX 3, Litman 6/20/03 Depo., at 22.

May asserts that he discussed the decision not to call Noel with Litman.  PRX 1, May 2/20/04 Depo., at 50-51. Litman recalls no such conversation: "I never heard [May] explain to Mr. Crawford, and he never explained to me why Mr. Noel was not called as a witness."  PRX 3, Litman 6/20/03 Depo., at 23.  Litman says that he was "shocked" to learn that May never issued a subpoena for Noel.  *Id*. at 57. "[T]he shocking point was that if he had not subpoenaed [Noel] and yet made the opening statement that he was going to call him, that's what would have shocked me."  *Id*. at 59.

It is difficult to understand why, based on Litman's expressed concern and "shock" at May's failure to call Noel as a witness, Litman did nothing about it.  Mr. Litman at no time drew the matter to the court's attention *in camera*, nor to his client's.  He did not file a motion under seal, did not confront May at any time during the more than six week trial, nor did he timely seek to address the matter with the court in any other way.  Nothing prevented Litman from arguing for Noel's transport to and attendance at trial in California.  Noel was incarcerated and available.  If Litman's view of trial strategy was so contrary to his co-counsel's, he was free and had a duty to bring the issue to the court's attention by an *ex parte* motion to withdraw and/or for an *ex parte*, *in camera* hearing with Crawford

present to discuss the issue of Noel with the court.

Given Noel's overwhelming credibility problems, likely perjury if he were permitted to testify, and sordid background, the decision <u>not</u> to call Noel as a defense witness was not shocking, nor was it ineffective assistance.[4] One view of May's trial tactics is that he sought to make the best of the worst, by in effect telling the jury what Noel said and would say, without the risk associated with actually putting Noel on the stand.  May was able to present the Noel

---

[4] Petitioner repeatedly points to Mr. Litman's opinions about the impact of May's failure to call Mr. Noel as a witness.  Litman testified:

> Q. Do you believe that, as an attorney, when you represent to a jury what a witness is going to say and you don't call that witness, that, in fact, not only is it not sound strategy but it's actually damaging potentially to your clients' case?
>
> A. Absolutely. I mean, an opening statement is not evidence, but really that's the first chance that a lawyer gets to speak with jurors about the theory of the case and what the evidence is going to show or not going to show.
>
> And you know, at the core of representation of a client is the jury having the belief or the knowledge that defense counsel, no matter what the evidence is, is being candid with them. Because it they - if you tell them certain things and it does not come about that way or you give them, the jurors, this is what the evidence is going to show that, then not only do they hear the evidence that is adverse to the interests of the client, but then they're looking it over and saying, "Wait a minute. The attorney told me the evidence was going to show something else.  This guy or gal or whatever, lady, is not a credible person and it's not somebody who, when I hear them speak again, that I'm going to have confidence in or respect in."

PRX 4, Litman 11/10/05 Depo., at 63-64:2.  But, ineffective assistance of counsel occurs when counsel's conduct falls "below an <u>objective</u> standard of reasonableness."  *Brown v. Ornoski*, 503 F.3d 1006, 1011 (9th Cir. 2007) (emphasis added).  Co-counsel's subjective opinions are not relevant, as he was not offered or qualified as a standard of care expert.

"framing defense" through his cross-examination of Beckcom and Kirk Johnson, while avoiding the potential disaster Noel represented.  Based on Noel's testimony and conduct, Noel was an unpredictable and unreliable witness -- a veritable "time bomb."

The evidence May did elicit regarding Noel and the "framing" theory showed that a law enforcement officer stopped Noel near Mark Crawford's old residence at 1:30 a.m. on June 4, 1996, the same night Brueggen's body was found. R.T. 3744-45 (Perkins), 3127-28 (Rivera).  After a search, officers located a briefcase containing Brueggen's driver's license and other personal belongings.  R.T. 3118-3134 (Rivera).  May emphasized these and other facts related to the "framing" defense during his closing argument:

> When you found -- combine it with the other evidence now.  He's driving the car that Nick Brueggen was driving. He's using Nick Brueggen's telephone.  The body is found buried behind his building.  And the dead man's briefcase with his wallet and personal possessions are in his house.  Pretty good case. Pretty good case.  So if you want to frame someone --and, you know, the neat thing about that case, it doesn't even take anybody to testify.  You know, it's a good plan because all you have to do is call someone up on the telephone with a quarter.  And if you succeed in getting them down there to drop off the briefcase at the right time where he didn't get caught by the police, there you have it, nice and simple.
>
> Go look behind Mark's building, there is a body there. When you arrest him, his son is going to be driving Brueggen's car.  Mark is using the telephone and the briefcase is hidden in his house, in his

garage there, or in the attic. A person doesn't have to go down there.  So it's a great way to frame somebody.

In fact, it's so obvious, how many people could reasonably say that a murderer, one who is smart enough to be head of a crime family, is going to do all this stuff to implicate himself?  It is absurd that anyone would do that. When they found the body out behind your house, you are going to get on the telephone and say, "Noel, Noel, see if you can get the briefcase down to my house so they can find that too." Doesn't make any sense.  "Noel, why don't you stop the police and ask them how to get to my house."  Noel apparently isn't a bright light.  That part doesn't make sense to anybody.

But the briefcase was on the way to Mark Crawford's house.  It didn't get there.  And because it didn't get there, you should infer that somebody was behind the conspiracy to plant him with that piece of evidence.  That's reasonable to assume.

Now, if you believe that -- and see, incidentally, what are we doing here?  Do I have to prove that he was framed?  Do I have to prove who killed Nick Brueggen or why?  No, I don't.  What you are doing as jurors is you evaluate the government's proof for its quality, for how good it is.  And you say to yourself, "Am I convinced beyond a reasonable doubt that Mark Crawford is guilty about this murder?"  Because what causes you reason for doubt in this case is that, in part, because if he is getting planted with evidence, he's not guilty.  You don't plant yourself -- or plant people with evidence that are guilty.  You know, that's what you do to innocent people to frame them.

R.T. 4309-11.

    In this way, May was able to provide a basis for the framing defense, without placing the highly impeachable, disreputable, and incredible Noel on the stand.  May made a reasonable tactical decision of trial strategy not to call

Noel, avoiding the risk Noel's sordidness and incredibility would adversely taint Crawford's defense, and turned available, credible evidence into a defense that Crawford had been framed. Crawford in effect was able to "have his cake and eat it too."

b. **Lack of Prejudice.**

Even assuming, *arguendo*, that May's actions -- promising the jury he would call Noel and then failing to produce him -- were unjustified, the question still remains whether these acts were prejudicial to Mark Crawford's defense.

The time that elapsed between the opening statement and jury deliberations bears on this inquiry. In *Anderson*, the defense rested the day after opening statements. 858 F.2d at 17. *California v. Stanley*, 39 Cal. 4th 913, 955 (2006), distinguishing *Anderson* in part on the ground that the defense rested its guilt phase case nearly three weeks after delivering an opening statement promising testimony from a police witness who never materialized.

Here, May gave his opening statement on June 24, 1999, Doc. 470, and the jury began to deliberate on August 10, 1999, Doc. 437, more than six weeks later. Any danger that the jury had been "primed" by May's opening "to hear a different version of the incident," but then disappointed, *Harris,* 894 F.2d at 879, or led to believe that defense

witnesses could not "live up to their billing" in a manner they "would not forget," was minimized and dissipated by the significant temporal gap of over six weeks between the opening statements and the close of evidence.

The evidence of guilt was overwhelming.  Crawford kept close company with Brueggen, John Crawford, Beckcom, and other Family members.  They frequented the "Compound," where they partied, and traveled together to gamble and party, and also did so in Mississippi.  They created and operated a number of fraudulent businesses in Texas and Colorado, from which hundreds of thousands of dollars of unlawful insurance premiums were generated and converted to finance their mutual "high rolling" life styles.  All the conspirators had a common incentive to eliminate Brueggen, a "snitch," who they believed was cooperating against them with federal authorities, and who could cause their criminal activities and profits to be brought to an end, as well as their ultimate prosecution for this extensive criminal wrongdoing. Petitioner ignores the conspiracy charges, his joint and concerted activities with John Crawford, Beckcom, Johnson, Brueggen, and Bochicchio, and the strong incentive to murder Brueggen to preserve their ongoing criminal enterprises and avoid prosecution.

May's failure to call Noel as a witness was neither

deficient nor prejudicial.  The petition is DENIED on this ground.

2.   **Petitioner's Alibi Defense.**

a.   **Failure to Present School Attendance Records Through Principal.**

In the federal trial, Petitioner's two teenage sons testified they were with their father throughout the day of the murder, May 6, 1999.  May 6, 1999 was a Monday -- a school day.  At the San Antonio trial, May called the principal of the boys' high school to testify that neither of Crawford's sons attended school that day.  *See* PRX 2, May 11/31/05 Depo., at 78.

May testified at his deposition that in the second state court trial, immediately before the principal testified, May noticed the boy's attendance records contained an incorrect date.  GX A, May 2/20/04 Depo., at 28.  The state prosecutor did not notice the error, but May was so concerned about the error that he did not mention that alibi evidence during his closing argument to the jury in the second state court trial.  *Id.* at 28-29.

When he began the federal trial, May made the decision not to pursue that alibi evidence because he was concerned that the federal prosecutors would read the records more carefully and discover the error.  *Id.*  May believed such an

error would lead to impeachment of the principal's testimony. *Id.* Even though he felt that petitioner's sons were telling the truth about their whereabouts that day, May believed the records would contradict their story. *Id.* at 82-84.

The tactical decisions of trial counsel cannot form the basis for a claim of ineffective assistance of counsel, so long as the decision is strategically reasonable. *Mancuso*, 292 F.3d at 954. Litman suggests that May's purported "strategic reason" for not calling the principal is a post hoc rationalization, because May never discussed this strategic decision with him: "[A]s far as the school attendance records I can just tell you that Mr. May never asked me to locate those, never showed those to me, and never discussed those with me." PRX 3, Litman 6/20/03 Depo., at 40. Likewise, Litman was unaware that the principal was a potential witness and stated that he and May never discussed whether the principal would testify in the Fresno trial. PRX 4, Litman 11/10/05 Depo., 4 at 88.

Litman also opined that May's purported strategic decision was not objectively reasonable, because the principal could authoritatively resolve any contradiction or ambiguity in the written attendance record. *Id.* at 91. "[Y]ou would ... think that the principal would be a responsible person, who doesn't have a bias, who would be

cognizant of when school was in session and [sic] not, and have no reason whatsoever to -- to fabricate that fact."   PRX 5, Litman 2/24/06 Depo., at 182.   But, Litman's ignorance of and/or disagreement with May's strategic thinking does not necessarily render May's reasoning suspect.   May was the Texas trial lawyer, who had twice tried Petitioner's state murder case, and served as lead counsel in the federal case. He recognized substantial risk in the potential impeachment effect of the school attendance records on the principal's testimony.   May reasonably concluded that the attendance records, which contained an "incorrect" date that could have undermined the alibi defense if noticed by the government, were so potentially harmful that it was not worth risking putting the principal on the stand.   This was an informed strategic choice of experienced trial counsel.

        The Petition is DENIED on this ground.


        b.   <u>Failure to Object to Prosecution's Reference to Petitioner's Son's During Closing Arguments.</u>

        Petitioner also contends that his attorneys should have objected during closing argument to the government's suggestion that his sons were in school on Monday, May 6, 1996.   When asked about this allegation during his deposition, May testified:

1

2   Q: There's also the allegation that you did not
    object to the comments or statements made by the
3   prosecutor regarding the testimony or lack thereof
    of Mr. Crawford's children.  Do you understand what
4   that comment is about?

5   A: Yes, I do.  And I remember that happening in the
    trial.  And I told Mr. — Mr. Litman was making
6   objections during the argument.  That was my
    recollection, is that's one of the things that I had
7   him do, 'cause after I finished final argument, I
    was tired.  And I think this comment was made in the
8   government's final argument.  It was not made in the
    opening statement.  So I'm sure it was Mr. Litman
9   that was making those objections then.  I remember
    the statement that he made.  And the only objection
10  that I think might have applied had to do with the —
    I think he said something like it was Monday, it
11  would have been a school day, they would have been
    in school that day, and that's clearly outside the
12  record.
            But I don't know if Mr. Litman objected,
13  and I don't recall if I objected.

14

15  Q: Okay.

16  A: But that's something I might not object to.

17  Q: Why is that?

18
    A: Well, you know, it's — first of all, the
19  objection that you would make is outside the record,
    which doesn't tell the jury the solution to the
20  problem.  It doesn't tell the jury that this was a
    Monday or that this was the 5th of May or whatever.
21  When the judge sustains it, even if he instructs
    them to disregard it, I don't think those
22  instructions are very effective in final argument.
    And, in fact, an objection can add to the result of
23  having the jury pay too much attention to that
    particular aspect of the testimony and think that
24  was something we were trying to slip by them.
    Whereas if you ignore it, that's significant really.
25  It's just speculation over, well, maybe it was
    Monday, and it should have been there.  I didn't
26  think it was that effective when it was made, and
    it's not something I would have objected to in final
27  argument for those reasons.

28

GX A, May 2/20/04 Depo., at 29-30.

Litman corroborated May's assertions, testifying during

his deposition:

> Q: With regard to the closing where the government
> told the jury that the boys were in school, any part
> of the closing argument, whose duty was it to object
> to argument that's outside the evidence between you
> and Mr. May?
>
> A: I would say it was mine.
>
> Q: Did you even recognize that an objection should
> be entertained at that time?  And I – what I mean by
> that is based on lack of familiarity with the case.
>
> A: I need to think back to um ... to the exact
> wording, but I think the argument was that they were
> probably in school.
>
> Q: I think it was: You know these boys were in
> school.
>
> A: Uh huh.  It's a very touchy issue about arguing,
> you know objecting during a closing argument.  And
> unless it is something significant, I usually don't
> do it.

GX F, Litman 2/24/06 Depo., at 283-284.

The responsibility for objecting was not May's, it was

Litman's.  Even if it were May's, not objecting was a

reasonable strategic decision, agreed with by Litman, to

avoid emphasizing the point to the jury and any adverse

impression created by interrupting opposing counsel's closing

argument.  Judicial review of a defense attorney's summation

and strategic choices on objecting during closing argument is

highly deferential, and "doubly deferential when it is

1
2
conducted through the lens of federal habeas.  *Yarborough v.*

3
*Gentry*, 540 U.S. 1, 6 (2003) (per curiam).

4
C.   Preparation For Trial in Federal Court.

5
6
        Petitioner's opening brief alleges that May failed to

7
adequately prepare for trial.[5]  It is undisputed that this

8
was an extremely complex criminal trial.  The charges against

9
Mr. Crawford carried the potential for the death penalty, and

10
the United States filed a notice of its intention not to seek

11
that sentence only several weeks before trial.  *See* Doc 334,

12
Notice, dated June 9, 1999.  Witnesses were located across

13
the country, in California, Texas, Colorado, Mississippi, and

14
Washington, D.C.  The trial itself lasted over six weeks.

15
        Petitioner contends that May's prior experience

16
17
defending Crawford in two Texas murder trials was

18
insufficient preparation for the federal trial.  Petitioner

19
places great weight on statements May made during his

20
deposition:

21
                I really felt like I was kind of the one-man
22
                lawyer/investigator down there in California. And
                there just didn't seem to be - it seemed to me that
23
                if I was going to be doing that with that large a
                case and that much discovery, I ought to have, like,
24
                two other lawyers assisting me in the - three

25
_____

26
        [5] Crawford's initial habeas petition also asserted that May admitted
to Petitioner during a telephone conversation that he was unprepared at
27
the federal trial.  Petitioner's reply brief abandons this specific
argument in favor of a general assertion that May was simply unprepared
for trial.  Although May admits telling Crawford that he felt
28
overburdened by the trial, he denies stating that he was unprepared.  GX
A, May 2/20/04 Depo., at 23.

> lawyers really – you know, spending a hundred
> percent of their time on the case when the trial is
> going on and have some time before the trial begins
> to get familiar with it and handle aspects of the
> case. And there just wasn't any of that there.
>
> Would it have made a difference? I don't know. But
> in being completely honest with you about that, I
> have to tell you that I felt like, you know, I was
> under a huge pot of responsibility there and didn't
> have just a lot of people to help me with it.

PRX 1, May 2/20/04 Depo., at 24-25; *see also id.* at 23 ("I

was overburdened for the trial. I felt like that both Mr.

Litman and I were overburdened given the volume of the

trial."). May also believed that Litman "wasn't available

most of the time" to help; May didn't "really feel like [Mr.

Litman] was co-counsel." PRX 2, May 10/31/05 Depo., at 122;

*see also* PRX 1 at 19 ("I didn't feel like [Litman] was full-

fledged counsel.").

Prior to trial, May told Litman that, without at least a

30-day continuance, May "couldn't be fully prepared to

represent Mark Crawford." PRX 4, Litman 11/10/05 Depo., at

22. Although May requested a continuance, that request was

denied. Litman testified that he and May did not discuss

their respective roles at the trial "until a few days before

trial." PRX 3, Litman 6/30/03 Depo., at 12-13. May and

Litman decided that May "would be primarily responsible for

the examination of witnesses." *Id*. at 13:15-13:17. Litman's

role "would be to assist [May] if he needed any legal

research, if we needed to be doing any last-minute

preparations, speaking with witnesses. And [Litman] would be

primarily responsible for the objections at trial, the

evidentiary objections." *Id*. at 13.   Litman now asserts that

May's preparation for trial was inadequate:

> Q:   Can you tell the court whether or not your
> feelings about Mr. May's preparation — did you feel
> that he had prepared in advance of this trial or can
> you describe that to the court?
>
> A:   ... [I]t appeared to me that he was doing
> everything at the last minute, that he had not done
> any significant preparation. It appeared to me that
> he was relying substantially on his knowledge of
> facts that he had garnered from the state court
> cases as opposed to preparation that he had done to
> get back up to speed or to make sure witnesses were
> subpoenaed for this Federal trial.
>
> Q:   Based on your experience as an attorney having
> handled hundreds of cases, did you feel that that
> was an effective way for him to prepare for this
> case?
>
> A:   No.

PRX 4, Litman 11/10/05 Depo., at 76.

Litman observed that May appeared to have done no prior

preparation for the cross-examination of witnesses:

> [T]here were multiple times when witnesses were
> testifying that Mr. May appeared to me to be taking
> -- to be making notes, not taking notes, but making
> notes of cross-examination, that he was going to ask
> the witness.  And it just struck me that he was --
> that seems like something that should have been done
> at an earlier time and not while the witness was
> testifying.

PRX 3, Litman 6/20/03 Depo., at 24.   Litman stated that he

attempted to work with May during trial, but May never seemed

to work on the case:

> Several occasions I did try to get together with Mr.
> May after court or on a weekend to talk about the
> case, but after a few attempts it was just -- it was
> fruitless. One time we got together on a Saturday
> and we ended up at a gun show. And I thought we were
> coming to the downtown area to work on the case and
> he ended up at the fairgrounds at a gun show.

PRX 4, Litman 11/10/05 Depo., at 82.

Three weeks into trial, May told Litman that Litman

would present all of the defense witnesses, a significant

change from the workload allocation the two had discussed

prior to trial.  PRX 3, Litman 2/24/06 Depo., at 175.  Litman

did not learn this until after the witnesses arrived in

California.  *Id*.  Litman and the investigator met with the

witnesses who did arrive in California to prepare their

testimony.  *Id*. at 168-169; PRX 6, D. Cordis Aff., at ¶8.

May did not participate in these witness preparation

sessions.  PRX 6 at ¶8.

Shortly after Litman began presenting defense witnesses,

Litman fell ill with a condition serious enough to require

hospitalization for several days.  PRX 3, Litman 6/20/03

Depo., at 40.  The district Court inquired whether May could

proceed.  R.T. 3482.  May represented to the Court that he

was "ready to proceed," because Mr. Litman "at this stage was

pretty much assigned to lining up the witnesses that we were

going to get in" the following week.  *Id*.  Thereafter, May picked up primary responsibility for the presentation of Petitioner's defense witnesses.

Notwithstanding Litman's version of events, May presented Crawford's defense in an organized, effective manner.  May had already tried the murder charges twice, so he was familiar with the factual and legal issues surrounding that portion of the trial.  *See* GX A, May 2/20/04 Depo., at 18.  In May's opinion, the additional fraud allegations were not terribly complex, and he believed he had properly prepared a defense to those allegations.  *Id*.  May reviewed the discovery produced by the government in his office in Corpus Christi, Texas before he came to California for trial. *Id*.  He had the discovery shipped from Texas to California and put in his room at his hotel so he could continue to review it.  *Id*.  He reviewed the discovery again before each witness testified, even during evening hours, because the government gave notice of who they were going to call the following day throughout the trial.  *Id*.  It is noteworthy that other defendants, not Mark Crawford, the leader, were more involved in the day-to-day operation of separate businesses in the criminal enterprises.  The four other defense attorneys participating in the trial more thoroughly cross-examined and defended against the RICO, money

laundering, and wire fraud aspects of the case.

Despite his reservations about May's unwillingness to cooperatively prepare for trial, Litman agreed that May was prepared each day for trial.  Litman testified that May was familiar with all the witnesses called by the government.  GX C, Litman 6/20/03 Depo., at 30.  When asked specifically if he believed May was prepared to handle the testimony of each witness and the events of each particular court day, Litman testified that he could not think of any particular instance where May did not know who the witness was or how to handle the witness.  *Id.*

The government cites *Dows v. Wood*, 211 F.3d 480 (9th Cir. 2000), in support of its argument that May's preparation and performance were not insufficient.  In *Dows*, petitioner alleged his counsel was unprepared for trial, having undertaken only three days of preparation, conducted no witness interviews or investigation, and failed to contact a possible alibi witness.  *Id.* at 486.  The Ninth Circuit affirmed denial of the petition because counsel was familiar with the facts of the case, had a definite defense strategy, made cogent pretrial arguments about the use of evidence at trial, and reviewed interview statements.  *Dows*, 211 F.3d at 486-87.

Here, like in *Dows*, May was intimately familiar with all

68

the witnesses and evidence in the murder portion of the case,
and the criminal activities in Texas and Mississippi.  He
reviewed all of the allegations and familiarized himself with
relevant interview statements and grand jury testimony from
witnesses in the white-collar portion of the trial.  May
vigorously cross-examined witnesses throughout the case, and
skillfully constructed a closing argument based on the record
evidence.  May was extremely articulate, and his Texas
accent, courtesy, and affable demeanor, were well received
and effective with the jury.  Although his cooperation and
communication with Litman may not have been ideal, Litman
became ill, and May's conduct demonstrated a strong grasp of
the relevant facts and witnesses and a clear and reasonable
defense strategy.  May was prepared and effective in
challenging the government's case.

D.   <u>May's Financial, Emotional, and Psychological Well-
     Being.</u>

     Petitioner contends that May was suffering from a host
of financial, emotional, and psychological problems that
adversely affected his performance.

     1.   <u>Family Problems</u>

     Several months before trial, May separated from his wife
and filed for divorce.  PRX 1, May 2/20/04 Depo., at 10, 66-
67.  Shortly before trial, May's oldest child was arrested

for cocaine possession. *Id.* at 16. Because of his family situation at home, one of May's children -- then, seven years old -- traveled to Fresno and spent part of one trial day sitting in the courthouse hallway unsupervised. *Id.* at 67-68; PRX 5, Litman 2/24/06 Depo., at 275-76.

May testified that, contrary to Petitioner's assertions, his wife had not abandoned him and his son; rather, he separated from his wife and moved out of his home before the trial. GX A, May 2/20/04 Depo., at 10. May testified that it did not distract him and that it would have been more distracting if he had not moved out. *Id.* May also explained that his stepson's arrest did not distract him from adequately representing Petitioner. *Id.* at 16-17. May testified that he ignored all the personal events of his life, stayed in Fresno, California, and worked almost exclusively on Crawford's case. *Id.* There is insufficient factual support for Petitioner's assertion that May's personal life interfered with his duties as counsel.

   2.   <u>Drug and/or Alcohol Abuse.</u>

At the time of trial, May was taking Oxycontin for severe, chronic pain. PRX 2, May 10/31/05 Depo., at 88-89. Oxycontin, a powerful opioid narcotic, is known to be highly addictive. PRX 11, J. O'Donnell Aff., ¶¶ 4-5. May had also been prescribed the sleeping pill Ambien, a hypnotic used to

treat insomnia. *Id.* at ¶¶ 4, 7. May acknowledges having two drinks with dinner at a local restaurant and bar. PRX 1, May 2/20/04 Depo., 56-58; PRX 3, Litman 6/20/03 Depo., at 28. According to James O'Donnell, a pharmacologist who submitted an affidavit in support of Petitioner's reply brief, the combination of Oxycontin, Ambien, and alcohol put May "at great risk for impairment in his cognitive abilities" and "drug induced impairment" during trial. PRX 11 ¶¶ 9, 11. The consequences of these impairments, including disorientation, confusion, impaired judgment, reduced ability to deliberate clearly, increased impulsivity, and reduced energy, may "limit [ones] ability to clearly and competently plan for and address ... multiple complex issues and on the spot decisions needed" during a trial. *Id.* at ¶11. However, Mr. O'Donnell was not present at the trial and did not observe May exhibiting any of these symptoms of impairment.

The court observed May on a daily basis. He was alert, intelligent, articulate, and fully engaged. May was in command of himself and the defense throughout the trial. This speculative theorizing about impaired function never manifested itself in any way during trial. May exhibited no symptoms or manifestations of drug or alcohol use during trial, nor in his communications with the court over that more than six week period.

1

2    3.    **Financial & Legal Problems.**

3    May admits to having some financial problems during

4    trial.   PRX 2, May 10/31/05 Depo., at 65; PRX 3, Litman

5    6/30/03 Depo., at 33.   He had to borrow money for his law

6    practice during the trial "to make sure that I didn't go out

7    of business while I was sitting in California."   PRX 1, May

8    2/20/04 Depo., at 27.   May accepted loans of $7,500.00 per

9    week during trial, plus hotel expenses, from Thomas Henry,

10   Crawford's son-in-law, for a total of $43,800.   *Id.* at 40-41;

11   PRX 7, T. Henry Aff.   However, there is no evidence that

12   these loans or May's financial extremis impaired May's

13   performance as defense counsel.   His finances were not a

14   factor during trial.

15

16

17   E.    **Was May Noticeably Asleep During Major Portions of the Trial?**

18       "[W]hen an attorney for a criminal defendant sleeps

19   through a substantial portion of the trial, such conduct is

20   inherently prejudicial and thus no separate showing of

21   prejudice is necessary."   *Javor v. United States*, 724 F.2d

22   831, 833 (9th Cir. 1984); *see also Burdine v. Johnson*, 262

23   F.3d 336 (5th Cir. 2001) (en banc) (counsel's sleeping during

24   trial is presumptively prejudicial).   "[U]nconscious or

25   sleeping counsel is equivalent to no counsel at all."   *Javor*,

26   724 F.2d at 834.

27       Both Petitioner and Litman recall that May was

28

"noticeably asleep" during portions of the trial.  Mr. Crawford asserts in his sworn Petition that May "was fast asleep sitting at the defense table and [Petitioner] had to bump him to get him to wake up."  Doc. 812 at 30.  Although not specifically sure if May was asleep, Litman recalls that "[t]here were times when I saw [May] with his eyes closed." PRX 5, Litman 2/24/06 Depo., at 287.  Litman also recalls that May was so exhausted during closing argument that he had to sit down halfway through and deliver the remainder of his argument from a chair.  *Id*. at 287-88.  Dr. O'Connell asserts that the combination of Oxycontin, Ambien, and alcohol put Mr. May at serious risk for falling asleep during trial.  PRX 11 at ¶13.  After trial, Mr. May obtained a prescription for a medication specifically to increase his wakefulness and counteract the drowsiness and sedation caused by Oxycontin. *Id*. at ¶10.

May was questioned about sleeping during the proceedings:

> Q: The last allegation is that "you were noticeably asleep at the defense table during major portions of the trial."  Were you – at any time did you fall asleep at the defense table during the trial itself?
>
> A: No, I did not fall asleep.  One time Mark kicked me under the counsel table and asked me if I was asleep.  And I asked him, "You know, why did you kick me under the table?" "'Cause your eyes were closed, and your head was back.'"  And I told him that a lot of times I'll listen to the testimony by doing that.  I'll close my eyes and put my head back

73

1

2

3

4

5

6

7

8

9

10

      and put my glasses on my forehead, my reading
glasses, and just listen to the words of the
witness, and so – that's the way I concentrate
better at it.  And I told him that I'm not asleep
when I do that, I'm listening to the witness.  And
that happened, I believe, around the second or third
day of trial, and after that I don't think we had a
problem with it again.

      Q: So you never fell asleep at the defense table
during the trial?

      A: That's a funny thing, if you're asleep, you
really don't know it or not, unless somebody woke
you up.  And nobody woke me up, so I presume I never
fell asleep.

11  GX A, May 2/20/04 Depo., at 31.

12

13        There is insufficient evidence that May was sleeping.

14  He did not need to be awakened or prompted by Litman or

15  anyone else, nor did he ask for matters to be repeated or for

16  a read back of missed testimony.  No attorney, defendant,

17  prosecutor, court security officer, or defense attorney ever

18  reported or drew the court's attention to May's sleeping.  No

19  one observed May sleeping during trial.  The lack of

20  contemporaneous evidence or notice to the court of concern

21  about this alleged sleeping requires DENIAL of the petition

22  on this ground.

23

24  F.   Did May Operate Under A Conflict of Interest?

25

26       1.   Relevant Facts.

27        Petitioner contends that May's prior financial dealings

28  with Les Tatum ("Tatum"), May's banker and vice president and

loan officer of Kleberg First National Bank ("Kleberg Bank"),
dissuaded May from actively pursuing a defense to the white
collar criminal charges against Petitioner and his co-
defendants.

From 1993 to 1998, Tatum provided May with financial
assistance and May obtained numerous bank loans through
Tatum. *See* May 2/20/04 Depo., at 15.   Among other things,
Tatum opened new accounts for May to enable May to continue
writing checks; extended the repayment time for May's
existing loans; ensured that the bank honored May's checks
despite May's overdraft status; and transferred money into,
out of, and between May's bank accounts.   PRX 38, May Depo in
*Kleberg v. May* at 92, 122-24, 134, 139-40.   Additionally,
Tatum provided bank loans to May's wife.   *Id.* at 219.   In
sum, Tatum approved 18 loans to May, totaling over $1
million.   *See* PRX at 42 n.4 (citing PRX 38, May's Depo. in
*Kleberg v. May*, in which all loans are reviewed).   May
maintains that some of these loans were renewals of previous
loans.   May believes that Tatum forged May's signature on
some of the loan documents, and that Tatum pocketed the
proceeds for himself.   PRX 38, May Depo. in *Kleberg v. May* at
33-34, 78, 188, 240.

Tatum also made loans to two of the government's
cooperating witnesses in the federal trial, Crawford's co-

defendants, many of the staff leasing companies owned by Petitioner and his family and friends, and to Petitioner and his family, including for payment of May's legal fees in the two State murder trials. *Id.* at 24-26; *see generally,* PRX 18, Tatum grand jury testimony.

Shortly before the start of Crawford's federal trial, Tatum was indicted by a federal grand jury in Corpus Christi, Texas for embezzlement. R.T. 3816-17. These accusations centered on Tatum's approval of various bank loans and conversion of some loan proceeds. *Id.*

During the Fresno federal trial, Kleberg Bank filed suit against May, seeking to recover $500,000 in unpaid loans approved by Tatum. PRX 35 (original petition) & 36 (return of service). Although May believed he did nothing wrong in connection with the loans from Tatum, May concedes that he may have been "concerned" that he might be indicted for participating in Tatum's bank fraud. PRX 1, May 2/20/04 Depo., at 15-16. He was "concerned that ... the Feds wouldn't be able to figure out that I [May] wasn't doing anything wrong, that it was Les Tatum doing it." *Id.* at 15. But, he was "not overly concerned. I figured they would figure it out, and no one talked to me about it." *Id.* at 16. Litman recalls that May was concerned that he might be charged criminally, but testified that the issue was <u>not</u>

76

"weighing on" May; rather "[it] was something he mentioned in passing."   Litman 11/10/05 Depo., at 38:2-11.

Before the federal trial, May was alerted that Tatum had met with the federal prosecutor and was a potential witness in Crawford's case.   PRX 2, May 11/31/05 Depo., at 47.   May later inquired whether Tatum would in fact be called as a witness for the prosecution, informed the prosecution of his connections with Tatum, and was notified that Tatum was not going to be called.   *Id.* at 56-57.   Tatum never testified at trial.

Federal prosecutors did offer evidence of Tatum's loans to Petitioner and his co-defendants as part of a broad pattern of conduct establishing that the staff-leasing companies were fraudulent.   Mike Beckcom testified that John Crawford introduced Beckcom to Tatum, and that Tatum gave Beckcom an unsecured $50,000.00 loan to capitalize one of the fraudulent staff-leasing companies:

> Q:  What did you have to tell Mr. Tatum to get
> $50,000?
>
> A:  Not a word.

R.T. 1352-53.   The prosecution emphasized this testimony in closing argument:

> [Mike Beckcom talked about how John Crawford took
> him to Kleberg Bank, 45 minutes outside of Corpus
> [Cristie], instead of down the street, and
> introduced him to Les Tatum, and how he got a loan
> from Les Tatum for Progressive with absolutely no
> collateral, absolutely nothing. None.

1

2      R.T. 4220.

3           In the cross-examination of John Crawford, the

4      government sought to tie each of the members of the alleged

5      conspiracy to Tatum and his criminal activity at the Kleberg

6      Bank

7                Q.  ... Can you tell the jury who Les Tatum is?

8                A.  He is a banker at Kleberg First National Bank.

9                Q.  And he is your banker; is that right?

10               A.  Yes, he was my banker.

11               Q.  And how far is Mr. Tatum's bank from where you

12               are?

13               A.  From where I live or from the office?

14               Q.  Well, from where you live.

15               A.  45, 50 minutes.

16               Q.  45, 50 minutes?  And that's a 50-minute drive?

17

18               A.  Approximately, yes.

19               Q.  And Mr. Tatum was not only your banker, he was
                 Mark Crawford's banker, too, wasn't he?
20

21               A.  I don't know if he was his personal banker.  He
                 was the banker for the business, Superior Employee
22               Staff Management.

23               Q.  You got loans from Mr. Tatum; isn't that true?

24               A.  Yes, I did.

25               Q.  And Mark Crawford got loans from Mr. Tatum?

26               A.  Probably.

27               Q.  And Mr. Galvan got loans from Mr. Tatum, isn't
                 that true?
28

78

1

2          A.   Probably.

3          Q.   And Geneva Garza got loans from Mr. Tatum; isn't
           that true?
4
5          A.   I have no idea.

6          Q.   Michael Beckcom got loans from Mr. Tatum; isn't
           that true?
7
8          A.   I believe that's the way it turned out, yes.

9          Q.   Isn't it true you introduced Mike Beckcom to Mr.
           Tatum?
10
11         A.   I called Mr. Tatum and Mr. Tatum said he would
           meet with Mr. Beckcom.  I took Mr. Beckcom over
12         there.  I waited in the lobby.  Whether he got a
           loan or not, I do not know.
13
           Q.   All right.  TNT Quick Stop got loans from Mr.
14         Tatum?

15         A.   I don't know.

16         Q.   Do you know that Mr. Tatum is currently under
           indictment?
17
18         A.   I heard rumors.

19         Q.   For bank fraud?

20         A.   I don't know that.

21    R.T. 3489-91 (J. Crawford).

22         The prosecutor reviewed eleven specific loans that Mr.

23    Tatum had approved for entities owned or controlled by the

24    Family.  *Id*. at 3489-97.  This review focused on loans Tatum

25    had approved for Superior Services (one of the fraudulent

26    employee leasing companies), even though the company had

27    filed for bankruptcy at the time of the loan:

28

79

1

2          Q.  Now, I believe you said Superior Services went
           bankrupt?
3

4          A.  It filed bankruptcy, but the -- it never went
           through the whole procedures, kind of a -- I don't
5          know what you would call it.

6          Q.  Okay.  And is Superior Services still operating
           at all?
7

8          A.  No, not at this time.

9          Q.  Can you explain to the jury why, on November
           30th, 1995, you, signing as Superior Services,
10         received a $79,000 loan from Mr. Tatum?

11         A.  When was the date?

12         Q.  November 30th, 1995.

13         A.  No, I wouldn't have any idea why I would do
14         that.

15         Q.  Can you explain why on January 10th, 1996 you
           received a $60,000 loan from Mr. Tatum under
16         Superior Services?

17         A.  No, I'm not sure why.

18
           Q.  Can you explain to the jury why on March 1st,
19         1996, you received an $85,000 loan from Mr. Tatum
           for Superior Services?
20

21         A.  I have no idea.

22    *Id.* at 3494-95 (J. Crawford).

23         In his examination of John Crawford, May sought to

24    introduce an innocent explanation for the loans:

25         Q.  Now, the prosecutor mentioned something about
           Les Tatum's fraud indictment.  Have you read a copy
26         of that indictment?

27         A.  No, I have not.

28
           Q.  Are you aware that Mr. Tatum was accused of

1

2

> making false loans to individuals and stealing the
> money from those loans?

3

> A.  No, I'm not.

4

*Id*. at 3512.  May did not disclose his own, similar

5

experience, despite the fact that May believed himself to be

6

one of these unnamed "individuals" who had been a victim of

7

Tatum's schemes.  *See* PRX 38 (May Depo. in *Kleberg v. May* at

8

33-35; 78).

9

> To rebut the suggestion in the prosecutor's cross that

10

the Crawfords' use of a banker whose office was a 45-50

11

minute drive from Corpus Christi suggested some impropriety,

12

May tried to prompt John Crawford into identifying other

13

"clients from Corpus Christi" who might have been customers

14

of Tatum:

15

16

> Q.  Now, Kleberg National Bank or Mr. Tatum in
> particular, had a lot of clients from Corpus
> Christi, didn't he?

17

18

> A.  Yes.

19

> MR. CULLERS:  Objection, lack of foundation.

20

> BY MR. MAY:

21

> Q.  Do you know if he did?

22

> THE COURT:  Sustained.

23

24

> THE WITNESS:  I know for a fact he did.  Some of our
> clients also banked there.

25

> BY MR. MAY:

26

27

> Q.  Was Mr. Tatum considered to be a good banker at
> that time?

28

> A.  Yeah.

1
2
        Q.  And some of the clients that you had at the bank
        there, do you know who they were, just offhand?

3
        A.  No, not right off hand.

4
R.T. 3517 (J. Crawford).

5
6
        On re-direct, John Crawford's attorney sought to

7
rehabilitate his client's credibility by emphasizing the

8
explanation May had identified in his questioning:

9
        Q.  Now, let's go to something that happened today.
        And I heard that apparently this Mr. Tatum -- what's

10
        his first name?

11
        A.  Les.

12
        Q.  Les Tatum, the banker, has apparently been

13
        indicted for bank fraud.  Is that your
        understanding?

14
15
        A.  That's my understanding.

16
        Q.  And from what Mr. May said, apparently it's for
        making loans to – making phony loans, in other

17
        words, making it look like he's loaning some money
        to somebody when he really isn't?

18
        A.  I can only say that some of the loans they

19
        mentioned and the amount, I did not do.

20
*Id.* at 3540.

21
        On August 3, 1999, during a break from testimony, the

22
government announced its intention to introduce a series of

23
charts documenting Tatum's loans to the various staff-leasing

24
companies.  R.T. 3813-15.  May objected to the government's

25
proffer, describing to the Court his own situation without

26
27
disclosing his personal involvement:

28

1
2
3
4
5
6
7
8

> [T]here is a more expansive problem here, and that's
> that Les Tatum is currently under indictment in
> Corpus Christi.  And part of the indictment has to
> do —and I haven't seen the indictment yet, I don't
> think —but from talking to his lawyer and from
> talking to Mr. Kusik, who is the Assistant U.S.
> Attorney there that's handling the case, it appears
> that Mr. Tatum was doing loans to various
> individuals at the bank and taking the proceeds of
> those loans without the knowledge of the depositor,
> without that person knowing the loan was being made
> and without that person knowing that any funds were
> proceeds taken from his loan.

9
10
11
12
13

> Mr. Tatum has been since indicted.  And there were
> various attorneys in Corpus Christi who had loans
> through Mr. Tatum that were notified by the bank to
> pay the loans.  And it turns out those were never
> loans that the lawyers signed on and nor did they
> receive any funds from them.  And Mr. Tatum
> apparently embezzled those amounts.

14   *Id*. at 3816-17.  May never informed the Court that he

15   believed he was one of the "various attorneys in Corpus

16   Christi" who had been "notified by the bank to pay the

17   loans," and/or one of the "various individuals" from whom Mr.

18   Tatum had taken "the proceeds of those loans without the

19   knowledge of the depositor, without that person knowing the

20   loan was being made and without that person knowing that any

21   funds were proceeds taken from his loan."

22

23   May then suggested to the Court that further unspecified

24   witnesses might be necessary to testify to Tatum's *modus*

25   *operandi* in order "to rebut the inference that the

26   prosecutors are seeking to get from the evidence."  R.T.

27   3817-18.

28

> [T]he modus operandi of Mr. Tatum in the federal
> case in Texas included his setting up an account in
> the name of the person who was going to receive the
> money without that person's knowledge and putting
> the money into that account under that person's
> name, and then getting the money out of that
> person's account by transfers to other places.  And
> so the fact that the money is traced to an account
> under the person's name, that occurs in all the
> places where Mr. Tatum defrauded the bank.

*Id.* at 3819.

The district court acknowledged that establishing this modus operandi would be "antithetical" to "knowledge on the part of these defendants or any operation of the conspiracy or wrongdoing, because, in effect, [Mr. Tatum is] stealing from them in the process of doing that."  *Id.* at 3825-26. However, John Crawford admitted his direct dealings with Tatum to obtain unjustified loans.

Around this point in the trial, May says he approached the prosecutor and "told him that [Tatum] was my banker and that I was concerned about that if he was called as a witness in the case."  PRX 2, May 11/31/05 Depo., at 57.  May recalls telling the prosecutor:

> If Tatum is going to be a witness in this case, he
> was my banker, you know, as I'm sure you have seen.
> And I think he said, yeah.  And I said are you going
> to call him as a witness.  And this was like —golly,
> this had to be almost at the end of the trial.  And
> he said, no we've decided not to call him.  There's
> just nothing we've got to call him about. And that
> was it.

*Id.*

Neither May, Litman or anyone else raised the relationship between May and Tatum with the Court, and Tatum was not called as a witness.  The government did not seek to introduce in rebuttal the flow-charts documenting Tatum's loans.  May put on no evidence regarding his relationship with Mr. Tatum.

Following Crawford's conviction, Tatum pleaded guilty to one count of bank fraud.  PRX 39, Judgment in *U.S. v. Tatum*. May was subpoenaed by the U.S. Attorney's Office to provide exactly this modus operandi testimony at sentencing in the criminal case against Tatum:

> I've been asked to testify about, basically, his [Mr. Tatum's] —I guess what we would in the criminal law business call his MO, his modus operandi, his way of operating at the bank, of doing the loan, and, you know, you not actually receiving the money from the loan proceeds, and, instead, the — you know, Mr. Tatum would say, well, I'm going to disburse the money for you, and then him not paying off the previous notes like he was supposed to and things like that.

PRX 38, May Depo. in *Kleberg v. May* at 40.

    2.  <u>Analysis.</u>

Petitioner argues that May's relationship with Tatum dissuaded May from effectively and vigorously pursuing a defense based upon Tatum's *modus operandi*.  Crawford contends that such a defense could have responded to the prosecution's implications that Tatum's loans were evidence of Crawford's

involvement in a bank fraud conspiracy.  1:02-cv-6498, Doc. 7 at 60.  Crawford alleges that since May had an interest in avoiding both criminal and civil liability, May did not wish to reveal the extent of his connections with Tatum through both the administration of adequate cross-examinations of the loan recipient witnesses and by disqualifying himself and introducing his own testimony as to Tatum's *modus operandi*. This theory is specious.

A criminal defendant has a sixth amendment right to effective assistance of counsel, including representation free from conflicts of interest.  *Strickland,* 466 U.S. at 692.  "In order to establish a violation of the Sixth Amendment [based on a conflict of interest] a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."  *Cuyler v. Sullivan,* 446 U.S. 335, 348 (1980). If this standard is met, prejudice is presumed because the "assistance of counsel has been denied entirely or during a critical stage of the proceeding."  *Mickens v. Taylor,* 535 U.S. 162, 166 (2002).  "Under this standard, an actual conflict is a conflict that affected counsel's performance-as opposed to a mere theoretical division of loyalties."  *United States v. Wells,* 394 F.3d 725, 733 (9th Cir. 2005) (quoting *Mickens*, 535 U.S. at 171).

"Ordinarily, [the term 'actual conflict'] denotes representation of multiple conflicting interests, such as an attorney's representation of more than one defendant in the same criminal case, or representation of a defendant where the attorney is being prosecuted for related crimes." *Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007) (citing *Mickens,* 535 U.S. at 176 ("until ... a defendant shows that his counsel <u>actively represented</u> conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance")(emphasis in original)).  To demonstrate an actual conflict, petitioner must show "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."  *Wells,* 394 F.3d at 733 (internal quotation marks omitted); *see also McClure v. Thompson,* 323 F.3d 1233, 1248 (9th Cir. 2003) ("The client must demonstrate that his attorney made a choice between possible alternative courses of action that impermissibly favored an interest in competition with those of the client.").  In contrast, a disagreement over trial strategy does amount to an actual conflict of interest. *Stenson*, 504 F.3d at 886.

Petitioner cites *Mannhalt v. Reed*, 847 F.2d 576 (9th

Cir. 1988), in support of the proposition that May and Tatum's relationship created an actual conflict of interest. Mannhalt was accused of conspiracy to commit robbery, attempted robbery, and several counts of robbery and possession of stolen property. *Id*. at 578.

Mannhalt was represented at trial by James Kempton, who had known Mannhalt for several years. *Id*. Prior to the conduct for which Mannhalt was to be tried, Kempton purchased a gold watch from Mannhalt. *Id*. Mannhalt assured Kempton that the watch had been purchased from a friend. *Id*.

The key witness in the state's case against Mannhalt was Tommy Morris, who agreed to testify against several individuals, including Mannhalt, as part of a plea bargain. *Id*. According to a police report Morris agreed to give information about twelve items. Item No. 11 read:

> 11. Attorney James Kempton purchased a stolen ring $1200 with $100 bills; taken from Lake Washington area. Also purchased a stolen bracelet.

*Id*. Kempton became aware of this accusation while preparing for Mannhalt's trial, discussed the accusation with Mannhalt, but did not point out a potential conflict of interest. *Id*.

At trial, Kempton conducted an "extensive cross-examination of Morris," and brought out "that Morris had received a favorable plea bargain for agreeing to testify. Kempton then confronted Morris with his accusation that

Kempton had purchased stolen property."  *Id.*  Kempton "became increasingly agitated during the cross-examination," offering his "own unsworn testimony that Morris' accusation was false: 'No, he's telling the police I'm buying stolen goods. I'm proving he's a liar.'"  The Ninth Circuit's description of Kempton's conduct continues:

> At one point Kempton asked his wife, a spectator, about her jewelry and she came forward and commented that she was wearing rings and that she hoped they were not glass. Kempton asked Morris many times whether he would lie and Morris replied: "Would you?" and "I've got up here and told the truth to the best of my knowledge." Kempton also asked Morris about the "diamonds from the market place" in evidence against Mannhalt. Morris admitted he had been in the donut shop where the jewelry had been seized and where Kempton had allegedly purchased stolen jewelry. Morris then volunteered that he had seen Kempton at the donut shop.
>
> Kempton admitted that he lost his composure during the cross-examination. In his affidavit submitted in these habeas corpus proceedings, Kempton stated: "I was visibly shaken and I was furious. The court cannot appreciate the furor one feels when being confronted by an absolute thieving liar and saying that one is the purchaser of stolen items." Also, during the cross-examination the trial judge remarked: "Things are coming a little unglued here, a little bit out of order."

*Id.* at 578-79.  Kempton did not take the stand to refute Morris' accusation.  *Id.* at 579.

The Ninth Circuit determined that an actual conflict existed:

> <u>We find that when an attorney is accused of crimes similar or related to those of his client, an actual conflict exists because the potential for diminished</u>

> effectiveness in representation is so great. For
> example, a vigorous defense might uncover evidence
> of the attorney's own crimes, and the attorney could
> not give unbiased advice to his client about whether
> to testify or whether to accept a guilty plea. *See*
> *United States v. Cancilla*, 725 F.2d 867, 870 (2d
> Cir. 1984) (counsel may have conspired with someone
> connected to defendant or similar fraudulent
> insurance claims and thus actual conflict existed);
> *see also United States v. Salinas*, 618 F.2d 1092,
> 1093 (5th Cir.) (trial judge was within discretion
> in disqualifying attorney over defendant's objection
> where attorney was target of investigation
> concerning events for which clients were indicted),
> cert. denied, 449 U.S. 961 (1980).

*Id.* at 581 (emphasis added).

Regarding the second *Cuyler* prong -- whether the
conflict adversely affected counsel's performance -- the
Ninth Circuit concluded that "Kempton should have
disqualified himself so as to be available to testify and
dispute Morris' testimony about the stolen ring."  *Id.*
(citing Washington State Rules of Professional Conduct 3.7
("A lawyer shall not act as advocate at a trial in which the
lawyer ... is likely to be a necessary witness....")).  The
Ninth Circuit found it particularly disturbing that Kempton's
"cross-examination of Morris put his own and his wife's
unsworn testimony before the jury.... put[ing] himself in the
position of arguing his own credibility, precisely what [the
ethical rules] seeks to avoid."  *Id*. at 852.

Second, the Ninth Circuit concluded that Morris'
accusation against Kempton "adversely affected Kempton's

cross-examination of Morris," because "Kempton's personal interest in preserving his reputation and avoiding criminal prosecution may have impacted the manner of the cross-examination." *Id*. The Ninth Circuit did note that Kempton and Morris' interest actually did not conflict in a traditional sense:

> Once Kempton decided to question Morris, both he and Mannhalt had an interest in undermining Morris credibility. The manner of the cross-examination indicated, however, that Kempton was motivated, at least in part, by personal concerns. The examination was by all accounts unorthodox. Kempton admitted that he was shaken and furious. Kempton's emotional performance may have effectively discredited Morris in the eyes of the jury. It is equally likely, however, that the jury viewed Kempton's anger as implying that Kempton and possibly his client were involved in illegal conduct. Kempton's personal feelings about Morris' allegation may have thus adversely affected his performance.

*Id*.

The Ninth Circuit also found that "having brought out Morris' accusation on cross.... Kempton's decision not to question Mannhalt [about the accusation] may have been affected by Kempton's personal concerns"; and that "because Kempton was the target of the same criminal investigation, he may not have pursued a plea bargain in which Mannhalt would agree to testify against Kempton." *Id*. In sum, the Ninth Circuit concluded that the allegations against Kempton "created an actual conflict and likely affected Kempton's performance in four ways":

1
2
3
4
5
6
7
8

>           [H]e could not call himself as a witness to refute
>           Morris' accusations but his cross-examination
>           included much of his own unsworn testimony, he
>           cross-examined Morris in an unseemly and emotional
>           manner, he did not question Mannhalt about Morris'
>           accusation on direct, and he could not pursue a plea
>           bargain that might implicate himself. Mannhalt has
>           thus met the requirements of *Cuyler* and shown a
>           violation of his sixth amendment right to effective
>           assistance of counsel.

*Id*. at 853.

Although *Mannhalt* clearly holds "that when an attorney

9
10
11
12
13
14
15
16
17
18
19
20
21

is accused of crimes similar or related to those of his

client, an actual conflict exists because the potential for

diminished effectiveness in representation is so great," May

was not "accused" of any crime at the time of the federal

trial.  May had been named in a civil suit to collect upon

the fraudulent loans issued to him by Tatum, and was

"concerned that... the Feds wouldn't be able to figure out

that [he] wasn't doing anything wrong...," but May was "not

overly concerned," and "figured they would figure it out, and

no one talked to me about it."  PRX 1, May 2/20/04 Depo., at

15-16.

22
23
24
25
26
27
28

Unlike Kempton, May was not rendered dysfunctional by

his emotions.  May's examination of John Crawford on the

subject of Tatum's fraudulent activities was not particularly

probing, but this was because John Crawford was not privy to

information sufficient to clearly establish the nature of

Tatum's fraudulent loans.

Petitioner, like Mannhalt, argues that May should have disqualified himself from representing Crawford, to enable May to testify generally about Tatum's misdeeds, e.g., that he was concealing his true banking operations from his customers.  Crawford contends that this testimony would have helped to exonerate Crawford and his co-defendants. Petitioner also suggests May failed to explore Tatum's misdeeds out of concern that his own connection to Tatum would be exposed.  This entire line of argument misses the broader factual context of the case, namely that the family knew their businesses were shells and shams and were undeserving of legitimate bank loans, making it likely that the jury would have viewed Tatum as another conspirator in aiding these fraudulent businesses.

Unlike in *Mannhalt*, where Morris was key to the prosecution's case, overwhelming evidence showed that the fraudulent nature of the Crawford Family's businesses went well beyond any loans Tatum made to Family-owned companies. Petitioner and others, without proper licenses, began underwriting employee welfare benefit plans under the name Viking Casualty Company.  After accepting hundreds of thousands of dollars of premiums, most of which were wire transferred to members of the Family, Viking refused to pay claims submitted on behalf of policyholders.  Likewise, the

Family was siphoning money out of the employee leasing businesses so rapidly that the companies did not even have enough cash to pay employee taxes.   The Family received funds from the employee leasing companies through dummy payments to individuals, wire transfers, and large cash payments to individual Family members.   The Family operated a similar, unlicensed builder's home warranty insurance company by appropriating the name of a large, and reputable insurer, Progressive Casualty, without Progressive's knowledge or permission.   Money from this operation went to support Family activities.   Finally, the Family also profited from illicit marijuana sales and bankruptcy fraud.

The broad, repetitive, and pervasive nature of these unlawful activities could not possibly be written off as Tatum's doing.   No matter how crooked Tatum was made to appear at trial, he had nothing to do with the operation of the RICO entities.   Rather, Tatum's bank loans were to the employee leasing businesses.   Emphasizing the Tatum-originated loans would only have focused more attention on how bogus those companies were and how financially unworthy the Crawford companies were to receive any loans whatsoever. This would have adversely reflected on Petitioner as the kingpin of the Family businesses.   If any actual conflict of interest existed between May and Crawford regarding Tatum, it

had no impact on May's performance, as there was no strategic basis for May to introduce and amplify the "crooked-banker" defense.  Such a strategy would only have prejudiced Petitioner.  May's failure to do so was not an adverse effect resulting from a purported conflict of interest associated with an alleged failure to assert an *in pari delicto,* "devil (Tatum) made me do it" defense.

The petition is DENIED on this ground.


## VI.  CONCLUSION

For all the reasons set forth above, Mark Crawford's petition to vacate, set aside, or correct sentence, pursuant to 28 U.S.C. § 2255, is DENIED IN ITS ENTIRETY.


SO ORDERED
DATED: December 30, 2009
                              /s/ Oliver W. Wanger
                                 Oliver W. Wanger
                          United States District Judge